ST. LOUIS FIXTURE & SHOW CASE COMPANY, A CORPORATION, RESPONDENT, v. F. W. WOOLWORTH COMPANY, A CORPORATION, APPELLANT. —88 S. W. (2d) 254.

St. Louis Court of Appeals. Opinion filed December 3, 1935.

*Case, Voyles & Stemmler* for appellant.

12

*Grant & Grant* for respondent.

HOSTETTER, P. J.—This is an action in trover instituted in the circuit court of the city of St. Louis, on August 15, 1930. The personal property alleged to have been converted by the defendant is set out as follows:

28 booths 6' x 6' and all panel work
Panel partition
4 Column enclosures
1 L Shape Cigar Case 7 ft. x 4 ft.
1 Case with sliding doors

29 tables 26x48 with enamel shoes
24 tables 30x30
12 hinge wing tables 30x30
1 music stand
3 Post enclosures with mirrors.

Plaintiff's claim of ownership of the property at the time of the alleged conversion was based on a chattel mortgage executed by the Canton Catering Company, a corporation, on the 22nd day of September, 1928, to secure the payment of fifteen promissory notes due monthly after date for the sum of $140 each.

The petition further averred that on the 1st day of May, 1929, by reason of default in the payment of said notes, plaintiff was entitled to the possession of said fixtures and that the amount remaining due and unpaid on the notes was the sum of $1596.45.

The petition further averred that on or about the 1st day of May, 1929, the defendant was in possession of said fixtures and that plaintiff made demand upon defendant for such possession, but that defendant refused to permit plaintiff to take possession of the fixtures and retained possession and converted the same to its own use and that on said date the fixtures were reasonably worth $4175; praying judgment for that amount together with interest at six per cent per annum from the 1st day of May, 1929, and costs.

The answer contained, first, a general denial, also a specific denial that defendant was in possession of such fixtures on May 1st, 1929, and denial that plaintiff ever made a demand for the possession of said fixtures. Also a specific denial that it ever refused to permit plaintiff to take possession of such fixtures or that it ever converted same to its own use; also the specific denial of the value of same as alleged in the petition. It further averred that on or about June 25, 1927, Chu H. Quin and James H. Chu entered into a written lease with defendant, by the terms of which defendant leased to said persons for a term of ten years, the second floor of the building then located at the southeast corner of Eighth and Olive streets, in St. Louis, Missouri, and it was provided therein that defendant should have a lien against all the furnishings and fixtures which the lessee should have in the demised premises to secure the lessor on account of any and all claims it had, or, in the future might have, against the lessee on account of rent due or to become due under said lease; that the furnishings and fixtures mentioned in plaintiff's petition, being wall panel work and panel partitions, column enclosures, post enclosures with mirrors, tables, case with sliding doors, and music stand, were manufactured and installed by plaintiff in said premises on or about said time under contract with said Chu H. Quin and James H. Chu, who, thereafter, on or about August 8, 1927, assigned said lease to Canton Catering Company, a corporation, which entered into possession and became the tenant, under said lease, of this defendant,

14

conducting a restaurant business in said premises; that in April, 1929, Canton Catering Company, being insolvent, called a meeting of its creditors and advised them that it owed its creditors a general indebtedness of about $26,893.26, and that it owned substantially no assets except the chattels, furniture and fixtures in said place of restaurant business, and that a group of Chinese were willing to purchase and pay $3,500 for all assets and business of said company; that on investigation it was discovered that substantially $7000 of the indebtedness of the Catering Company was secured by chattel mortgage liens and that the probabilities were that not over $1000 in excess of the mortgage indebtedness could be realized and that a representative of defendant stated to the assembled creditors at the meeting that it would make no claim in respect to the chattels and fixtures for the rent due to it from the Catering Company as against the holders of the chattel mortgages; that prior to May 1, 1929, and while said creditors' committee was further investigating the affairs of the Catering Company, the latter abandoned the leased premises and all of its contents, by locking the door of the premises, leaving it unattended and without a caretaker and turning over the key to the defendant; that defendant then informed the creditors' committee of the action of the lessee, the Catering Company, and suggested that it be advised by the creditors of the corporation what plan would now be pursued, whether the creditors would institute bankruptcy or insolvency proceedings and, while awaiting the decision of said creditors' committee, the plaintiff sent its truckman who demanded the key in order that he might remove the furniture and fixtures claimed by the plaintiff under its chattel mortgage; that thereupon the defendant advised plaintiff of the action of the Catering Company in abandoning the premises to it and also advised that it believed that in all probability bankruptcy proceedings would follow and that there was no one in charge or custody of the premises and that it could not safely admit anyone to the premises until an inventory had been made which it would undertake to do at an early date and would then place a custodian in charge if not prevented by bankruptcy or insolvency proceedings and would then permit those who held chattel mortgages to submit same for inspection and to remove from the premises such property as to which they should be entitled, and that as to all property not covered by chattel mortgage it would claim a lien under its lease and would arrange to conduct a public sale of the property, and that, if plaintiff or any holder of a chattel mortgage cared to permit its property to remain on the premises and be sold, together with the other property subject to such mortgage, to save costs, removal and loss involved in separating the assets and selling them piecemeal, it would be agreeable to the defendant to enter into such an arrangement for the mutual advantage of all parties concerned and that if any amount should be realized

for mortgaged chattels over and above the amount due the holders of the mortgages, that an arrangement might be made so that defendant could receive the excess, if any, on payment of rent; that plaintiff made no objection, but assented and acquiesced in the reasonable position taken by defendant in good faith as aforesaid in respect to the performance of its duties as bailee and that plaintiff did inform defendant that it would be willing either to take the fixtures out and cancel its mortgage, or, if defendant believed that the auctioneers could sell the fixtures for a greater amount than the amount due plaintiff on them, then plaintiff would be satisfied to receive the net amount on its claim so that the balance might be turned over to the creditors; that defendant then asked the Catering Company for its approval of such proposed plan for such a sale of the assets and for information as to the claims of plaintiff and all other chattel mortgage holders; that thereafter, while these plans were being carried out, a fire occurred in the building on the 21st day of May, 1929, damaging the fixtures and the building so that it was immediately condemned by public authority; the defendant gave notice to plaintiff and other creditors of the occurrence of the fire and that plaintiff came to the building and took possession of all of its furnishings and fixtures not consumed by the fire; that the Catering Company, or members of the last board of its directors collected from the fire insurance companies damages for the destruction and injury done to the property, and that the plaintiff brought suit against the members of the last board of directors and recovered $600 and costs out of the insurance money; that it (defendant) never did have in its possession any of the furnishings or fixtures claimed by plaintiff under its chattel mortgage except in the qualified and temporary manner as bailee as hereinbefore stated, and that it had not converted the same or any part thereof, to its own use, and that the plaintiff by its acquiescence in the measures which defendant in good faith had offered and intended to take for the benefit of plaintiff and other holders of chattel mortgages and by its reception and removal from the premises of the salvaged fixtures and furnishings following the fire and by claiming a preference in the insurance money recovered on account of its furnishings and fixtures, and that by converting the salvaged furniture and fixtures to its own use became estopped to claim that the acts of defendant in respect to said furniture and fixtures amounted to a conversion.

The reply of the plaintiff was a general denial.

The trial was had on October 10 and 11, 1932, and the jury returned a verdict in favor of the plaintiff for $996.40 damages with interest thereon from May 1, 1929, amounting to $206.08, aggregating $1202.48. After an ineffective motion for a new trial defendant appealed the cause to this Court.

The evidence in the main tended to support the matters set up in defendant's answer.

The evidence also disclosed that plaintiff furnished and installed certain fixtures for the Catering Company in 1927, receiving part cash therefor and taking a chattel mortgage thereon, dated November 9, 1927, to secure the remainder due thereon, to-wit: $1660, and, that in 1928 plaintiff furnished and installed additional fixtures and furnishings, taking a new mortgage, dated September 22, 1928, in place of the old, or first mortgage, carrying a balance due on the first mortgage of $400 or $500 into the new mortgage, and, with what was due on the new items and fixtures furnished, made an aggregate amount of $2100 for which fifteen new notes of $140 each were executed by the Canton Catering Company. Both mortgages were duly recorded. A part of the equipment covered by the old mortgage had been installed so as to become a part of the realty and therefore, not all of the chattels described in the old mortgage were carried forward and incorporated in the new. The new mortgage provided that the mortgagor should keep the property described therein insured for the benefit of the mortgagee. Four of the fifteen notes first falling due were paid by the Catering Company, but it defaulted on the fifth notes, which matured on February 22, 1929, and, under the terms thereof, it was provided that upon such default all of the unpaid notes should become due and payable whether due on their face or not.

Thereafter, in April, 1929, the Catering Company, becoming more and more financially embarrassed, called a meeting of creditors for April 17, 1929, to determine what course might be agreed upon in respect to its indebtedness. Plaintiff, according to the testimony of Charles Quin, President and General Manager of the Catering Company, was invited, along with all other creditors, to attend this meeting, but there is no testimony that any representative of the plaintiff attended this creditors' meeting, but there is testimony that a majority of the creditors did attend and discussed the situation and it was learned that seven of the creditors held chattel mortgage liens on different portions of the contents of the restaurant, and that defendant had its blanket mortgage, contained in its lease, to secure its claim for unpaid rent and that there were certain general creditors who held no liens on any of the property and that most, but not quite all of the property was covered by special chattel mortgage liens on certain specific property. The attorney for defendant had looked up the legal phases of the respective liens and advised defendant (and so stated at the creditors' meeting) that defendant's blanket lien for rent was not superior to the lien of either the plaintiff or of any of the other chattel mortgage lien holders.

The testimony further showed that the Catering Company, despairing of meeting the claims of creditors, or of any feasible plan being

adopted, locked up its place of business and turned the key over to the lessor, the defendant, on April 25, 1929.

On May 1, 1929, plaintiff sent its truckman to get the key and bring plaintiff's furniture and fixtures away from the building and that the truckman endeavored to get the key, but was unable to do so, and so reported to Mr. Rovak, President and General Manager of plaintiff company, and that the latter then went in person with a customer, to whom he professed that he desired to sell some of the chattels covered by its chattel mortgage, and made demand for the key and, not obtaining it, finally talked by phone with defendant's attorney, who advised him that they would not let anything out of the place until they should thereafter let him know.

Two letters passed between the plaintiff and defendant, as follows:

(Letterhead of F. W. Woolworth Co.

Pierce Building, St. Louis, Mo.)

"May 16, 1929.

"St. Louis Fixture Co.,

"1601 Locust St.,

"St. Louis, Mo.

"Gentlemen:

"Confirming recent phone conversation with our attorney, we wish to advise that we are holding the property and fixtures of the Canton Catering Company located on the second floor of Eighth and Olive Street under lien for rent. We are advised that you claim a lien on certain portions of these fixtures under chattel mortgage. If you will send us a statement of your account showing the date of purchase, price of sale and give payments on account, also a list, by items, of the purchases and the cost each of these separate items as covered by your mortgage, also give us the date of filing of your mortgage so that we can be informed as to the extent of your claim, we will advise you at a later date in respect to disposal.

Please advise us fully whether it would be your idea to remove this property from the premises, thereby cancelling your mortgage, or would you care to enter into an agreement with the auctioneer to dispose of your property along with other materials to be disposed of.

"F. W. Woolworth Co.

"Truly yours,

"Per: C. A. Campen

"Const. Dept."

"CAC:AD"

18

(Letterhead of St. Louis Fixture & Show Case Co., Inc.
1601-1609 Cass Avenue) ·
"St. Louis, Mo.

"F. W. Woolworth Co.,
"Pierce Building,
"St. Louis, Mo.
"Gentlemen:    Attention: Mr. C. A. Compson.
"We are in receipt of your letter in regard to the Canton Cater-
ing Co.
"We have chattel mortgaged property filed on record at the City
Hall, said Mortgage filed on October 16, 1928, covering:
"All the booths, panels, panel partitions, column enclosures, L shape
cigar case, case having sliding doors, all tables, tables with hinged
wings, storm door and enclosure, shelving, one music stand, mirror
post enclosures, doors complete with hardware, in fact, the mortgage
covers all the fixtures, itemized.
"Our mortgage does not include any kitchen equipment with the
exception of dish cabinets.
"On the fixtures which are in the store occupied by the Canton
Catering Co., which cost them $4648.70 there is still unpaid 11 notes
@ $145.60 each, amounting to $1601.60.
"We would take the fixtures out and cancel the mortgage thereby,
or if you think the Auctioneers can sell these fixtures for a greater
amount than amount due us, we would only want the net amount of
$1601.60 and balance could be turned over to the creditors.
"You state in your letter that your are holding the fixtures under
lien, this is not possible as the fixtures are mortgaged to us and
legally cannot have any lien until mortgage indebtedness is paid up.
"We will thank you for a reply stating your intentions as to the
disposal of these fixtures as we want to proceed to take possession of
same or sell them.
"Yours very truly,
"St. Louis Fixture & Show Case Co.,
"H. Rovak,
"President."

Then on the night of May 21, 1929, the fire (which started on
the second floor about one a. m.), occurred, destroying the major por-
tion of the chattels in controversy, of which fire the defendant advised
plaintiff by letter dated May 23, 1929. Plaintiff thereupon took away
two loads of damaged fixtures, but claimed they were of little value.

No one of the other seven holders of chattel mortgages brought any
suit against defendant, but the testimony discloses that on December
31, 1930, the plaintiff began a suit against the members of the last
board of directors of the Canton Catering Company to recover the
insurance money on the fixtures which had burned on the night of
May 21, 1929, and settled the· suit by recovering $600; the other

creditors received twelve and one-half per cent on their mortgage indebtedness, which was paid out of the $4000 which had been recovered from the insurance company by the trustees for the Canton Catering Company.

Harry Rovak, President and General Manager of plaintiff company, testified to furnishing, in 1927, some panel work, booths and tables for the Canton Catering Company, which were installed at 8th and Olive on the second floor and taking a chattel mortgage for the balance due on same, and then to furnishing a second lot of fixtures in the following year and to getting a chattel mortgage of date September 22, 1928, from the Canton Catering Company, which included the new stuff furnished as well as the portion of the stuff furnished the preceding year and that the 1928 chattel mortgage was to take the place of the 1927 mortgage; that there was $400 or $450 still due on the stuff furnished in 1927 which was carried into the chattel mortgage of 1928; that the full indebtedness then was evidenced by fifteen monthly notes of $140 each; that they received from the Canton Catering Company the payment of the monthly notes regularly until January or February, 1929, and the company remained in default until it finally gave up the business; that he sent Ben Roetger, a drayman, to get the fixtures out; that the drayman called him up and told him that he (Roetger) couldn't get the key and that he ordered Roetger to come back and he went himself with a customer wanting to sell him some of the stuff; that he wanted to get the key to get in and the young lady called the manager and he said he would not let anyone in; that then he called up the Woolworth Company at the office and didn't know who he talked to, but they connected him with their attorney and the attorney answered and said they would not let anything out of the place; that they had it attached under their control and would not let it out until they let him know; that the fire occurred on the night of May 21; that he got out some of his goods after the fire, about 29 tables and the L-shaped cigar case and some of the panel work and some of the enclosures; that a suit was brought against the Canton Catering Company on account of loss of property in the fire; that he compromised the claim against the Catering Company and got $600 of insurance money from the trustees; that defendant by letter dated May 23, 1929, advised plaintiff of the occurrence of the fire and that the city authorities had condemned the building and had begun tearing it down.

Ben Roetger testified in substance as follows: That before the fire Mr. Rovak had sent him to get the fixtures; that he went there and they told him the door was locked and that he should go to the Woolworth store and that he went to the girl and she called a fellow over and he said he couldn't give him the stuff; that he had brought the fixtures up there originally but didn't install them; that he didn't remember how many tables he brought; that he expected to take what

he decided was theirs, but that he didn't know just what was mentioned in the chattel mortgage; that after the fire he hauled away two loads of stuff for Mr. Rovak; that he took away 29 tables and some of the paneling, that all the glasses in the mirrors were broken; that he got a cigar case and the L-shaped case and signed a receipt for what he got.

The attorney for the defendant testified that a statement had been given to the creditors that defendant did not claim priority over the chattel mortgages with respect to the lien under the leases; that he then investigated that question and came to the conclusion that that was true in respect to the plaintiff, notwithstanding the fact that plaintiff's mortgage was put on record after the defendant's lease had been put on record and that the holders of the chattel mortgages so far as defendant was concerned should be freely accorded priority as against defendant's lease or lien; that he discussed the matter with Mr. Richards (Auditor for the Woolworth Company and custodian of its leases) and went to the premises with him and looked over the situation; that they (he and Mr. Richards) had but a short list of the holders of chattel mortgages and after looking over the situation they agreed that the thing to do, and the way to handle it, was, in the event any holder of a chattel mortgage or any other person who came there and asked them to account for what had become of this property, they should be able to show what was done and that the only way to do that would be to make an inventory and also acquaint themselves, if possible, as to what properties were covered by a mortgage or mortgages and who was entitled to it; that he thought it was about between April 25, and May 1, that he first learned of the fact that the Canton Catering Company had abandoned the premises; that sometime around those dates Mr. Rovak called him on the phone and stated that he had been referred to him by the Woolworth Company. Defendant's attorney gave the following version of that telephone conversation with Mr. Rovak:

"He said he had sent his driver up there and wanted the key to the premises in order that he might go in there and get his furniture and fixtures. I explained to him the fact that I did not know whether he was fully advised of the fact that the Canton Catering Company had abandoned the premises or not, and I explained to him that they had. I told him that they walked out, locked the door, and left everything there. In fact, they left the food there. It was necessary for some one, two or three days later, to go over there, and I think, induce them to send some of their men down from the Canton Tea Garden and clean out the vessels containing food, and they just locked the door and left everything there. I explained to Mr. Rovak that we thought it was possible there would be a bankruptcy proceeding instituted, and that we would be called to account for what we had done, and that we intended to take an inventory and intended to put

a man up in the premises so that these parties claiming chattel mortgages or other liens could come there and some check could be made on their property and they could get their property out of that room. I do not know whether Mr. Rovak assented or dissented, as far as words were concerned. I do not recall that he said he would not stand for us taking that precaution. I am sure he didn't say anything to the effect that he was going to institute any suit, or take issue with us, or that he thought it was unreasonable that we should want to make this investigation, and I didn't hear anything more about the fixtures end of it until after the fire.''

Defendant's attorney further testified that meantime he advised Mr. Campen (Superintendent of Construction of property for the defendant and Supervisor of its installation) and also Mr. Richards, that apparently everything of any value in that room was mortgaged and that in order that the defendant might avoid any charge of unfair dealing that what was left should be sold at public auction under the lease or lien; that an attorney representing one of the other chattel mortgage holders suggested that inasmuch as they would have to conduct a sale at auction it might be to the interest of those who had heavy and expensive merchandise or tables there to allow their property to be sold in the same way; in other words, the sale to take place subject to the chattel mortgages; that he then talked to the auctioneer and asked if he thought such a sale would be practical if any of them wanted to sell the property subject to the mortgages, and, as a result he went to Mr. Lich, attorney for the Canton Catering Company, and asked if he would furnish a certificate stating who held chattel mortgages and what they were entitled to take out and what was the amount of the claims; that as a result of this, a letter was furnished by the Canton Catering Company giving the information desired. This letter was under date of May 14, 1929, directed to defendant and signed by Canton Catering Company, gave the names of each of the seven chattel mortgage holders with a description of the property covered by the mortgages and the amount secured thereby, and also contained a waiver of any notice of sale and also contained this provision: ''We hereby waive notice of any sale by you to subject all such property to your lien and agree that subject to all superior liens which may exist, if any, by virtue of the aforesaid mortgages, you may sell all of said property at private sale, or in your discretion at public sale to be held at such time and place and under such notice as you may deem best and at such sale you may purchase same.''

Defendant's attorney further testified that after said letter was received he advised Mr. Campen to immediately complete making the inventory which he had been intending to make, and with all possible speed to get these things out of the premises one way or the other; (all the property after the abandonment by the Canton Catering Company remained in the premises rent free) ; that if a joint sale could

be made, or any method or manner, to free the defendant of the responsibility and care of having all of the assets of the Canton Catering Company dumped on its lap; that they were proceeding in that way and, as he thought in harmony with every holder of chattel mortgages, until after the fire; that he had tried to get the certificate from the Canton Catering Company through Mr. Lich showing the names of the chattel mortgage holders and description of property and amount of their claim since on or about May 1st; that he never advised the Woolworth Company at any time to claim ownership of the particular property covered by plaintiff's chattel mortgage superior to the rights of plaintiff; that the Woolworth Company did not do anything other than exercise usual and ordinary care and prudence to preserve the property up to the time of the fire; that it first induced Mr. Quin to send some men back there and clean up; that the second thing it looked after was to prevent outsiders or strangers, who had no business in there, from coming in by keeping the premises locked and then proceeded to see that the property got into the hands of those where it properly belonged, in the manner that he had stated, by arranging for these steps to be taken, namely, to get a certificate from the Canton Catering Company as to the facts and the making of an inventory in order to expedite the matter and that he personally went to the City Hall and spent some time trying to examine the chattel mortgages himself; that he examined six or seven chattel mortgages from the records there; that he was very much confused with regard to the chattel mortgage of plaintiff, because of the fact that the chattel mortgage given in 1927 did not describe exactly the same property which was contained in the later mortgage executed in 1928; that certain articles were included in the 1927 mortgage which were not included in the 1928 mortgage; that there were 29 tables, 30x30 in the 1927 mortgage which were not described in the mortgage of 1928; that there were other articles in the 1928 mortgage not included in the 1927 mortgage; that on May 16, under his direction, a general letter, of that date, was sent to each holder of chattel mortgages. On cross-examination the defendant's attorney testified that in his conversation with Mr. Rovak, when the latter called him up over the phone, he told him (Rovak) that just as soon as they could possibly make the arrangement they would let him know to have a man up there and he could send or come up there on the premises and that they would have someone there; that at present the premises were vacant and locked up and no one there, that no one could wait on him; that they would have to get someone up there that knew something about plaintiff's property; that as soon as they were able to do that then he could come up there and get his property; and that he said that very emphatically, and that he thought at the time that Mr. Rovak was a little bit unreasonable in asking them to give him a key when there was no one there and he

knew there was no one there; that he told him he would let him know when there was someone there.

In considering the legal aspects of this case we must take note of the radical distinction, as shown in the adjudications, between those cases wherein the defendant came into possession lawfully and did not dispute or defy plaintiff's title, and those cases wherein defendant's possession was wrongfully acquired or where defendant, by its acts, has shown an open defiance of plaintiff's title, as, where the goods have been sold. In the former class of cases the question of intent of defendant becomes material in the consideration of the question of alleged refusal. In such cases it is also necessary that a proper demand be made before a further detention of the goods can be regarded as a wrongful one.

In the instant case defendant's possession, whether symbolic or actual, was lawfully acquired. The premises were abandoned by the Catering Company's officers and the key turned over to defendant *nolens, volens.* The question as to whether the defendant's refusal to turn the key over to plaintiff when demanded constituted a tort, a wrongful act, amounting to conversion, or, whether its refusal under the circumstances was a reasonable one, is a crucial question in the case. Defendant became an involuntary bailee. As such it became subject to all the duties, obligations and liabilities which legally followed its position as such bailee. There were seven holders of mortgage liens on divers and sundry articles of property located in the premises; besides, there were numerous articles not encumbered by any lien save by defendant's blanket lien for past due rent. So that, for its own protection, it became highly important that the property belonging to each be properly listed and identified so one owner's property should not be delivered to another owner.

In many instances, a qualified refusal to deliver property has been held not to constitute a conversion. As, where the defendant has not the power of compliance at the time the demand was made, or, where the circumstances show a reasonable apprehension of the consequences in a doubtful matter. [26 R. C. L., sec. 34, pp. 1124-25, and cases there cited.] The text of Corpus Juris, Vol. 65, p. 51, sec. 79, reads as follows:

"Before complying with or refusing a demand for delivery of property in his possession or control the person on whom the demand was made may have a reasonable time for investigation and consideration of the validity of the claim and to determine what course to pursue."

This text is supported by numerous authorities gathered from many sources.

Plaintiff's petition charged the date of the conversion (demand and refusal) to have been on or about May 1, 1929. Plaintiff sets out in its brief that the date of demand and refusal was on May 1, 1929.

The verdict of the jury allows interest from May 1, 1929. So that, plaintiff's alleged cause of action accrued, if at all, on May 1, 1929. There is no evidence in the record of any demand attempted on any other occasion. So that, unless a proper demand was made on May 1, 1929, and a wrongful refusal, which amounted to a conversion followed, then the recovery awarded plaintiff cannot be permitted to stand. At that time defendant knew that there were two chattel mortgages on file in favor of plaintiff and six more in favor of others. It did not know at that time the details of the two chattel mortgages, the one in 1927 and the other in 1928; there was a manifest confusion between the two chattel mortgages and confusion as to what property they covered.

In view of the explanation given by defendant's attorney to Mr. Rovak, which was, in substance, that he could take the property away as soon as arrangements could be made in an orderly and systematic manner for him to do so, we have reached the conclusion that the retention of the property for the time being under all the difficult, doubtful and dangerous problems which confronted defendant following the sudden and unsought dumping into its lap of the conglomerate mass of heterogeneous stuff, was not wrongful retention and that it did not amount to a conversion of plaintiff's property. A veritable Pandora's box had been suddenly opened and its escaping ills enveloped defendant. In all fairness and reason defendant was entitled to time to investigate, to examine chattel mortgages, to make an inventory and to protect itself from liability on account of its having become an involuntary bailee, to keep one chattel mortgage holder from taking property of another, and to protect itself insofar as its own blanket mortgage lien for past due rent was concerned.

Further, plaintiff had no greater right to come in at that time and take out what he deemed to be his property than any of the other seven chattel mortgage holders did. In fact, no one of the seven mortgage holders had an absolute right to come in, under the chaotic conditions which existed when plaintiff sought the key, and pick out what he thought he was entitled to take.

There were no specific articles mentioned by either Mr. Rovak or the drayman when they demanded the key to the premises. In fact, neither of them had a list of the articles they proposed to take away nor did either one then know what articles plaintiff was entitled to take out. So that, under the circumstances then existing, the refusal on the part of defendant to turn over to them the key could not be regarded as a conversion. It was apparent that if the key should have been given to either the drayman or to Mr. Rovak, it was their purpose to enter the premises and take out what they *thought* they were entitled to under the chattel mortgages when, admittedly, neither of them knew. Now, suppose two of the chattel mortgage holders should have made a simultaneous demand on defendant for the de-

livery of the key. Defendant, of course, could only deliver it to one, and, necessarily, refuse delivery to the other. This would lead to the absurd conclusion that there was a conversion as to the one who didn't receive the key and no conversion as to the who who received it. It will appear, therefore, that the defendant here, when given the key to the premises, had correlative rights and duties, the latter of a responsible character, as owner of the reversion, and as bailee. It had not, under the evidence, anything but constructive possession at the time plaintiff sent its drayman, and, also called up defendant's office and attorney. Plaintiff had installed more fixtures in the premises than it had retained a mortgage lien upon. It was not entitled .to take out all it had put in. Defendant had previously determined to recognize all mortgages, but to claim its lien as to the unmortgaged property. Neither Mr. Rovak nor his drayman did more than go to the vacant restaurant, and, finding it locked, demand that they be given the key so that they might enter and take out what they *thought* were their fixtures, without advising defendant what they intended to take out, and, without really being in a position to know what they had a right to take out, because neither of them was provided, at the time, with a list of the things covered by the chattel mortgage.

"Trover will not lie against one rightfully in possession. Such a possession must first be transformed into a wrongful one by a refusal to surrender property. Hence, a demand and refusal are necessary for the maintenance of trover in all cases in which the defendant was rightfully in possession. . . ." [38 Cyc. 2032.]

Under the law, defendant was responsible to the Catering Company, and to each of the mortgagees, to exercise ordinary care, and, under the decisions, absolutely, in case of a wrong delivery. It informed plaintiff of its reasons for not delivering the key to the premises, which it had no right to deliver. Nor would it have done any good at that time to send a man to admit plaintiff, because defendant had not taken actual possession and made such inspection and inventory as would have protected it against wrong delivery. The drayman admitted he had no list or copy of the chattel mortgage, and intended to take what he thought should be taken. Defendant acted reasonably in the premises. It believed its precautions were necessary and justifiable. But as soon as defendant put Mr. Campen in charge, and he wrote to plaintiff and all other mortgagees, asking them if they would care to join in a public sale to be held on the premises, the plaintiff, in writing, by its letter, dated May 20th, replied that it would be willing to do so. This letter of May 20 was in answer to a letter of May 16, which similar to a letter sent out by defendant to each of the other seven holders of chattel mortgages.

It is contended by plaintiff that inasmuch as defendant's letter of May 16 contained a statement to the effect that it (defendant) was "holding the property and fixtures of the Canton Catering Company

. . . under lien for rent," that such statement was evidence of a conversion. However, when the letter is read as a whole we do not so construe it. The letter does not indicate that defendant sets up its lien for rent as being superior to the rights of plaintiff in such of the fixtures as plaintiff's chattel mortgage covers. On the contrary, it recognizes the superiority of plaintiff's chattel mortgage by asking for data in respect thereto so that it "can be informed as to the extent of your claim" and "we will advise you at a later date in respect to disposal." The closing paragraph of the letter reads as follows:

"Please advise us fully whether it would be your idea to remove this property from the premises, thereby cancelling your mortgage or would you care to enter into an agreement with the auctioneer to dispose of your property along with other materials to be disposed of."

Plaintiff, in its letter of May 20, replied to the said closing paragraph as follows:

"We would take the fixtures out and cancel mortgage thereby, or if you think the Auctioneers can sell these fixtures for a greater amount than amount due us, we would only want the net amount of $1601.60 and balance could be turned over to the creditors. . . . We will thank you for a reply stating your intentions as to the disposal of these fixtures as we want to proceed to take possession of same or sell them."

Plaintiff's letter of May 20 does not indicate that it then regarded its property as having been converted by defendant on May 1.

Plaintiff's conduct in assenting to the auction sale as set out in its letter of May 20 and the retaking of the property not destroyed and its suing for and collecting insurance to the amount of $600 on the mortgaged property was inconsistent, to say the least, with its contention in this case that defendant converted the property on May 1.

Trover originally was a common law action of trespass on the case to recover damages against a person who had *found* goods and failed to deliver them to the owner upon demand, thereby converting them to his own use. It has in modern times been broadened in its scope and become an appropriate remedy to recover the value of personal property by the owner from another no matter how the possession is acquired. A necessary element is conversion by the party in possession, which is a refusal to give up possession of the property when demanded, accompanied by a denial of the title of the owner. It is distinguished from the common-law action of detinue and replevin in that in those two actions the specific thing converted is sought to be recovered, whereas, in trover the *value* of the thing converted is sought to be recovered and not the thing converted. A conversion is the gist of the action of trover.

Some cases hold that one electing to proceed in trover thereby abandons the property to the wrongdoer and proceeds for its value. [26

R. C. L., sec. 74, p. 1158; Acheson v. Miller, 2 Ohio St. 203; 59 Am. Dec. 663.] The generally accepted rule is that where the plaintiff recovers a judgment in an action of trover and it is satisfied, the title to the converted property vests in the converter and relates back to the time of the rendition of the judgment. This is the general holding in practically all jurisdictions. [65 Corpus Juris, sec. 243, p. 129.]

A very illuminating case on this subject is one decided by the Missouri Supreme Court in 1853, of ante bellum days, being the case of Carter v. Feland, 17 Mo. 383. This was an action of trover for a slave child. In this case the slave child died before trial, but after demand and refusal. The court held that if the slave child was the property of plaintiff at the time of demand and refusal to deliver, constituting conversion, plaintiff still was entitled to recover the value of the slave child at the time of demand.

Plaintiff bases its right to recover on a conversion of on or about May 1. It is so averred in its petition. In its main instruction, No. 1, "on or about May 1, 1929" was the time submitted to the jury to determine whether or not a conversion occurred. The only testimony offered in support of such a conversion was that in respect to Mr. Rovak and the drayman being refused the key. The plaintiff in its brief sets out May 1 as the date of the conversion. The jury found in its verdict May 1, 1929, as the date of conversion, and allows interest from that date.

We, having reached the conclusion, as heretofore set out, that there was no wrongful detention of the property by defendant at that time, and, therefore, no conversion, it follows that the instruction in the nature of a demurrer to the evidence requested by defendant at the close of the testimony should have been given, and, consequently, it follows that the judgment of the trial court should be and is reversed. *Becker* and *McCullen, JJ.,* concur.