Garland Eugene ADAMS and Mary Elizabeth Adams, Respondents,

v.

Rue Finley MASON and Minnie J. Mason, Appellants.

No. 49167.

Supreme Court of Missouri,

Division No. 1.

June 11, 1962.

Robert E. Coleberd, Hale, Coleberd, Kincaid & Waters, Liberty, for appellants.

Blackford, Imes, Compton & Brown, J. William Blackford, Kansas City, for respondents.

COIL, Commissioner.

This is the second appeal of this case. The first, Adams v. Adams, Mo., 294 S.W. 2d 18, was dismissed as premature for the reason that the judgment appealed from was interlocutory and not final in that it provided for an accounting which had not been accomplished. The case was returned and a referee heard evidence on certain issues as had been directed by the trial court's modified interlocutory decree and filed his report. Defendants' objections and exceptions thereto were overruled, and a final judgment was entered from which defendants Finley Mason and Minnie, his wife, have appealed.

As noted by this court on the first appeal (294 S.W.2d 19), the action instituted below was one by which, among other things, plaintiffs sought to establish an interest in described farm land (hereinafter sometimes called the farm) and to obtain an accounting of a 16-year partnership farm op-

eration. The trial court had adjudged: that plaintiffs were the equitable owners of one half the farm (187.375 acres) subject to certain charges; that plaintiffs could acquire additional (adjoining) land from appellants at a specified price; that plaintiffs were entitled to an accounting of the partnership and to a determination of the amount of any encumbrances against the land. The case was sent to a referee for an accounting of the partnership operation and for a determination of the questions pertaining to the encumbrances which had been against the farm. The referee's report found that the land in question was free of encumbrance and that there was due plaintiffs from defendants the sum of $20,633.91 as a result of the partnership operation. The trial court thereafter "accepted and adopted" the referee's report and adjudged that defendants were entitled to a further credit in the sum of $4,327.28 ($2,710.28 charges against the 187 acres and $1,617.00, the cost of the additional land) and entered a final judgment that plaintiffs were the fee simple owners of the described 187.375 acres and of an additional 27.5 acres, and entered a money judgment in favor of plaintiffs and against appellants in the sum of $16,304.63.

Hedge Bland Adams and William Adams, brothers, became the owners of the family farm (about 375 acres) pursuant to the provisions of their father's will. They jointly operated the farm under arrangements not here involved. Both Hedge and William were married, but at some time prior to November 1933 Hedge's wife was in a hospital as a person of unsound mind. In May 1932 William and his wife, Hedge, and Mattie, the mother of William and Hedge, gave a deed of trust to a bank to secure a $16,000 note. By warranty deeds in October and November 1933 Mattie, the mother, conveyed all her interest in the farm to her sons Hedge and William. At the November 1933 term of the Clay County Circuit Court, William and his wife filed a partition suit against Hedge and his wife, joining the trustee and the bank. A guard-

ian ad litem was appointed for Hedge's wife. Hedge filed an entry of appearance and consent to trial, and the court, after hearing the evidence, ordered partition, a sale of the land, and distribution of the proceeds. William, the partition plaintiff, bid in the farm for $32,000. The sheriff's report indicated distribution of the proceeds (after payment of the costs and of the $16,939.55 indebtedness to the bank) in equal shares to William and Hedge, $7,300.54 each.

There was no satisfactory evidence explaining the circumstances of the partition proceedings. There was the fact that Hedge's wife was of unsound mind and there was the isolated and unamplified statement in the testimony of Hedge that the $7,300 shown as his distributive share was not received by him. In any event, on February 10, 1934, the sheriff conveyed the farm to William. On February 23, 1934, William and his wife executed two deeds of trust on the farm, a first to the same bank which had held the above-mentioned $16,000 deed of trust, to secure an $11,200 note, and, on the same day, a second to an individual securing a $5,618 note. On April 1, 1934, William and his wife gave a first deed of trust on the farm to the Federal Land Bank of St. Louis to secure a loan of $15,000 and a second to the Land Bank Commissioner to secure a loan of $4,000. Those deeds were acknowledged on April 10, 1934. On April 30, 1934, the deeds of trust which shortly before had been given the bank and an individual were released of record and the notes cancelled. On July 25, 1938, William and his wife, by their warranty deed acknowledged July 29, 1938, conveyed the farm to their son-in-law and their daughter, Finley Mason and his wife Minnie, the present appellants (who, along with William, Minnie's father, were the defendants below). On the same day, July 29, 1938, Finley and Minnie, as first parties, entered into a "contract" with Hedge Bland Adams, his son Garland Adams, and Garland's wife Mary, as second parties. On that same day, July 29, 1938, Finley Mason, William Ad-

ams, Hedge Adams, and Garland Adams entered into a partnership agreement for the operation of the farm.

We have noted that Finley Mason and his wife and William Adams were the defendants below; the other parties to the "contract," Hedge Bland Adams, Garland, his son, and Garland's wife Mary, were the plaintiffs below. The "contract" recited that the Masons were the owners of the farm which had been conveyed to them by William and his wife, subject to "existing incumbrances of record"; that the Masons had theretofore advanced $3,420.56 to William and Hedge, used by them to pay principal and interest on the "incumbrances" against the farm and for taxes, living expenses, and other purposes; that second parties had requested the Masons, and the Masons were willing, to convey one half the farm to Garland and his wife, and the Masons agreed to convey to Garland and his wife one half (187.375 acres) of the Adams farm at any time during the lifetime of either Garland or his father, Hedge, when either Garland or his wife Mary paid to the Masons the sum of $1,710.28 (one half the above-mentioned advance of $3,420.56) plus five per cent interest from date and paid all sums that might thereafter be expended by the Masons for the benefit of Hedge and Garland and Mary, plus five per cent interest on any such expenditures. It was agreed that one half of any sums expended by the Masons for the purpose of paying principal or interest on the encumbrances against the farm or for taxes or repairs and replacements should be considered expenditures for the benefit of Garland and his wife. It was further provided that if and when the payments above mentioned were made, the deed from the Masons to Garland and Mary would be subject to existing encumbrances of record and to a vendor's lien to secure a $1,000 promissory note, to be executed by Garland and his wife to the Masons, payable in ten years with interest at five per cent. The Masons agreed not to additionally mortgage the land except for the purpose of paying existing encumbrances. It was agreed further that if Garland and his wife or either of them became entitled to the conveyance of one half the farm under the terms of the agreement above set forth, the Masons would sell to them an additional 27.5 acres (adjoining the farm) at a price of $58.80 per acre. The agreement was to terminate at the death of the survivor of Hedge and Garland.

The partnership agreement among Finley Mason, his father-in-law William Adams, Garland Adams, and his father Hedge Adams (executed at the same time as the above-mentioned agreement and on the same day the deed was acknowledged by which Finley and Minnie Mason acquired the record title to the farm) provided for the operation of the Adams farm by the parties as partners; that each, except Finley Mason, would devote his full time to working the farm, which would include the raising of crops and the handling of livestock. The agreement specifically declared that Finley was the owner of the land and that the partners owned some mules and other livestock, an equity in a tractor, and some other farm implements. The partners were to receive the net earnings, or bear the losses, annually in the following proportions: one third to Finley Mason, one third jointly to William and Hedge Adams, and one third to Garland Adams. Necessary expenses incurred in the operation, including the amount of the taxes assessed against the land, were to be deducted from gross earnings to determine net earnings and there was to be an accounting as of January 1 each year or within a reasonable time thereafter. It was provided that the partnership bank account was to be carried as Adams-Mason, that William Adams was to sign the checks, and that the partnership would continue until a partner gave written notice to the others of his desire to terminate the partnership on the date stated in the notice.

Mrs. Garland Adams received a written notice from Finley Mason on April 19, 1954, advising her that he was cancelling all writ-

ten or oral agreements or contracts which she might consider to be in effect.

Garland and his wife and Hedge, plaintiffs below, each testified that they had never received an accounting. It appears to be undisputed that Mason was to keep partnership books and records. Mrs. Garland Adams testified that the agreement heretofore described as the "contract" was signed by her when Mason brought it to her home and described it as a "mortgage on the farm" so they could get some money and asked them to sign it. Garland Adams, who had lived on the Adams farm for 54 years at trial time (his father had lived there continuously for 80 years at trial time), testified that he had worked the farm since he was 15 or 16 years old and that he and Finley and William and Hedge had executed the "contract" at the lawyer's office where it was explained to him.

As a result of the record evidence heretofore reviewed and the brief testimony mentioned, the trial court, by its modified interlocutory decree, found that the record title to the 187 acres was in the name of Finley and Minnie Mason at the time the "contract" was signed; that the "contract" was in fact a mortgage on the 187 acres which Garland and his wife had given to the Masons to represent a debt owing to the Masons by the Adamses; and that on July 29, 1938, "said mortgage" consisted of the two land bank deeds of trust in the total amount of $19,000; that under the terms of those deeds of trust the Masons were required to pay the taxes and keep the buildings insured; that the two deeds of trust were paid on May 6, 1942; that the Masons made certain payments of principal and interest on the two deeds of trust, the exact amounts of which were to be determined by the referee. The trial court also found that a farm partnership had existed since July 29, 1938; that no accounting had been rendered to the plaintiffs by defendants; that the papers and books had been kept by defendants in their possession and under their control; and that a demand for an accounting had been made by plaintiffs. The trial court directed a referee to hear the issues relating to an accounting of the farm operation and relating to the matters pertaining to the land bank deeds of trust.

The referee conducted hearings in March and July, 1957. After brief testimony by Garland and his wife, the defendants, apparently conceding that Finley Mason had assumed the duty to keep partnership books and records and was obligated under the court's interlocutory decree to furnish the other partners with an accounting of the farm operations from July 1938 through 1954, produced as a witness a certified public accountant, Mr. Fleet, who had handled Finley Mason's accounting for the past several years. He testified that Mason operated the Mason Motor Company and the Mason Tractor Company at Platte City and engaged in various farming operations; that the witness had handled Mr. Mason's tax returns since 1935 except for three years, and was generally familiar with Mason's operations; that during the year just prior to his appearance on the stand he had been asked to prepare an accounting of the operation of the Adams-Mason farm. For that purpose he was furnished by Mr. Mason with a great volume of data, consisting of Mason's cancelled checks, bank statements, invoices, paid bills, some statements, and cancelled checks drawn on an old account of William Adams, and that he, the witness, had some old records which he had kept which had some connection with the matters in question; that from the data furnished he prepared a statement of the income and expenses of the farm operation, including part of 1938 through 1954. (The voluminous data were not in evidence and, of course, are not here for our examination.) The statement which he prepared constituted defendants' Exhibit A, which consisted of five separate schedules. As a result of cross-examination by plaintiffs and inquiries by the referee, a subsequent statement, identified as defendants' Exhibit B, was prepared; that exhibit purported to reflect certain matters in more detail and to correct certain errors which the witness

conceded existed in Exhibit A. For present purposes, however, the two exhibits, in combination, constituted defendant Mason's proffered accounting, not only of the farm operations under the 1938 partnership agreement but as to the matters connected with the land bank deeds of trust.

■ We shall first treat with the issues which have to do with the ownership of the 187 acres (one half the farm) described in the "contract." The record evidence, although unexplained in many details and incomplete and, in part, unsatisfactory, nevertheless makes it abundantly clear that whatever may have been the arrangement or exact agreement between the brothers, Hedge and William, it was their intention that the beneficial title to one half the farm remain in Hedge. Thus, it seems equally clear that Finley Mason and his wife held the legal title to the farm on the date of the "contract," subject to and in full recognition of Hedge's one-half interest which Hedge, by the "contract," effectively transferred to his son Garland and Garland's wife. The "contract" provision that Finley Mason had paid a certain amount of money on the principal and interest of encumbrances of record on the farm "for the benefit of the said William W. Adams and Hedge Bland Adams," was an unmistakable recognition of the fact that after the partition sale, although legal title to the farm was in William, Hedge continued to own one half. It is significant also in that respect that none of the money, so far as the "contract" disclosed, which was to be paid by Garland Adams to Finley Mason as a condition to a conveyance of Hedge's one half to Garland was a payment for one half the farm; on the contrary, the money Garland was to pay (at least in large part) constituted one half the sums which Mason had advanced as payments on encumbrances against the farm for the benefit of William and Hedge. As we see it, therefore, the record evidence establishes without serious doubt that as between the brothers, William and Hedge, despite William's purchase of the land at the partition sale, ben-

eficial title to one half the farm remained in Hedge and when William conveyed the legal title to the farm to his son-in-law and daughter, the simultaneously executed "contract" recognized that Hedge owned half the farm; and it was the intention of the parties through the "contract" to convey Hedge's title to one half to his son and his son's wife, who, in turn, agreed that their designated one half would secure an indebtedness to the Masons in the sum of $2,710 with five per cent interest, payable at any time during the lifetime of the survivor of Hedge and Garland, and would secure the payment of one half of any future expenditures on the farm by Mason and would secure the payment of one half the existing encumbrances (the land bank deeds of trust). See Cooper v. Newell, 263 Mo. 190, 197, 172 S.W. 326, 328 [1].

As we have noted, the Federal Land Bank and the Land Bank Commissioner's deeds of trust were executed in April 1934. The first deed of trust provided for regular payments of principal and interest over a period of 35 years beginning on December 1, 1934, and the second deed of trust provided for regular payments of principal and interest over a period of ten years beginning on the first day of December 1937. Both deeds provided for the payment of taxes and insurance by the mortgagor. Both the secured notes were paid and the deeds of trust satisfied on May 6, 1942. There is no satisfactory evidence in the record as to what the total amount due on the land bank deeds of trust was on the date of the execution of the "contract," nor as to whether payments "as due" had been made during the period from July 29, 1938, the date of the "contract," to May 6, 1942, the date of the payment of the land bank notes, nor as to the amounts of the payments or by whom such payments were made; and there is no substantial evidence as to whether the money for any payments which may have been made came from the proceeds of the partnership operation of the farm.

Mrs. Garland Adams testified before the referee that the payments under the two

land bank deeds of trust were to be made from the proceeds of the farm, but she did not know whether such was done. The accountant, as part of Exhibits A and B, indicated on a December 31, 1954 balance sheet for Finley Mason, that the original cost of the farm was $21,275.37, and on another schedule indicated Federal Land Bank loans in the sum of $22,098.06. The referee, in analyzing the accountant's testimony and Exhibits A and B, pointed out that there was no evidence to indicate that the existing encumbrances, that is, the land bank deeds of trust, amounted to $21,-275.37 on the date the "contract" was executed. The referee also correctly pointed out in his report that during the hearing he had called defendants' attention to the lack of evidence as to the matters pertinent to the land bank loans, such as when and in what manner the principal and interest were paid. The record shows that counsel for defendants indicated to the referee that during the interval between the first and second hearings, an investigation would be made of the records at the Federal Land Bank in St. Louis so that accurate detailed information could be supplied to answer the many questions relating to the details as to the payment of those loans. No such evidence was ever adduced and, as a result, there was a total failure of proof as to the manner of payment of the land bank deeds of trust. The referee's report assumed that payments were made thereon when due and thereby arrived at an amount which he considered as the amount of the existing encumbrances at the date of the "contract." The referee also found that the encumbrances should have been paid from the profits of the farm operation and he therefore deducted the total assumed amount from the net profit figure at which he had arrived. In view of the fact that we are forced to remand this case because of other matters, we shall not assume that information will not be available on a rehearing to permit accurate conclusions on this aspect of the case. In that connection, we observe that it appears that plaintiffs should be charged with one half the total amount of principal and interest which Finley Mason and his wife personally paid (i. e., paid by money derived from a source other than funds accruing from the partnership operation) to discharge the land bank indebtedness during the period from July 29, 1938, to and inclusive of May 6, 1942. If satisfactory proof is not adduced by defendants Mason that payments from personal funds were made and the amounts thereof, then the inference is justified that the land bank encumbrances were paid by money derived from the gross receipts of the farm operation and that those payments were or should have been charged as a partnership expense.

In connection with the matter of the payments to be made by Garland Adams provided for in the contract, we should observe that (assuming the validity of the July 1938 agreement in the light of a further agreement dated in December 1944, a matter we shall hereinafter discuss) the trial court correctly adjudged that Garland Adams and his wife are the owners of the additional 27.5 acres described in the "contract," upon paying or being debited therefor at the price of $58.80 per acre.

The "contract" provided that five per cent interest was to accrue on the $2,-710.28 (one half of $3,420.56 plus the $1,000 note) to be paid by Garland Adams and his wife to the Masons. The referee was of the opinion that he had nothing to do with that item and so reported. The trial court, after adopting the report of the referee found that the Masons were entitled to an allowance of $2,710.28 by reason of the items heretofore noted but made no reference to the matter of interest as provided in the "contract." Both Garland Adams and his wife Mary testified that beginning in 1944 they had tried to ascertain from Finley Mason the amount of their indebtedness and to make arrangements to pay it; that Mason had failed to satisfactorily answer their inquiries or to cooperate or to permit them to proceed to make arrange-

ments by loan or otherwise to discharge whatever their obligation was. It is true that the witnesses spoke specifically of mortgage indebtedness but their testimony justifies the inference that they were attempting to ascertain the amount of their total indebtedness, including mortgage indebtedness, in order that there might be a division. In the absence of other evidence, including an explanation of the "1944 contract" to which we shall again refer, which would affect the question, we are of the opinion that equitably the Masons are entitled not only to be credited with the principal sum of $2,710.28 but also with five per cent interest on that sum for a period of six years, 1938 through 1944.

We now consider the partnership accounting. While the plaintiffs, Garland and Mary Adams, testified that they kept no records during the period 1938 to 1954, and while, as we have noted, it was clear from all the evidence that Finley Mason either had the duty to or assumed the duty to handle the business end of the partnership and thus to keep proper records thereof, it is also abundantly clear from all the testimony, including the plaintiffs' and that of defendants' sole witness, the certified public accountant, that there were in fact no partnership books or records kept which reflected the transactions of the partnership operation of the farm. Mason (although the record discloses he was present at least at one of the hearings before the referee) did not testify. He not only failed to explain why there were no partnership books or records from which an accurate partnership accounting could be made, but he failed to identify or testify as to the validity of the data which were used by the accountant in an attempt to piece together an accounting; nor did Mason furnish evidence that the checks, invoices, bills, etc., which he furnished his accountant were properly chargeable as expenses to the Adams-Mason farm rather than to other of his farm ventures. There was evidence that Mason operated at least three other farms as well as an automobile business and a farm implement business, and that most of the checks used by the account-

ant to substantiate payments of claimed expenses of the partnership in question were Mason's checks drawn on his personal bank account. As a result, it is at once apparent that the purported accounting submitted by defendants as the work product of Mason's accountant, who testified as to the manner in which the conclusional figures were produced, could have amounted to nothing more than the unsubstantiated conclusions of the witness based upon certain instruments furnished him by Mason with instructions from Mason, based in part upon Mason's opinions conveyed to the accountant, and in part upon the "understanding" of the witness as to the partnership arrangements based on his experience through the years.

The referee correctly concluded that the purported accounting made by Mason, which showed plaintiffs indebted to him in the sum of $67,866.66, was so tainted with hearsay as to be of little value. The accountant frankly admitted that it was impossible to render a "good accounting" from the available information; that if, for example, he had been instructed erroneously that the charges for gas and oil used on the farm were not to be partnership expenses but were to be borne by the Adamses alone (and he had been so instructed erroneously), the resulting error would be carried through the entire accounting. In other respects, the accountant, in explaining how he arrived at various figures and conclusions, indicated that there was no demonstrably substantial basis for his figures although it may be that he had done the best he could under the circumstances and under his instructions from Mason.

Counsel for plaintiffs agreed with the referee's statement during the hearing that it would be impossible for anyone to state an account based on the evidence which had been adduced. Plaintiffs, through their counsel, insisted that they would offer proof of the reasonable rental value of the land and that, based thereon, the referee would be able to make a just and equitable determination of the status of the partnership account. Plaintiffs did introduce some evidence of the farm's crop yield for the year

1956 and the cost thereof, the amount received for the rent of certain pasture, and the rental value of a house on the farm. But plaintiffs did not pursue their theory to the extent that it was possible for the referee or that it is possible for this court to use their "reasonable rental value" theory as a basis for the statement of an account among the partners.

■ The referee fully and carefully analyzed the testimony and particularly the testimony of the defendants' accountant, as well as the accounting suggested by Exhibits A and B. We have examined the referee's analysis of the accounting submitted and we agree with his conclusion that defendant Mason failed to properly account. The referee concluded, however, that he could arrive at an equitable result by accepting Mason's figure representing the total gross receipts from the farm operation as shown on Exhibit B, irrespective of the accuracy of the remainder of the accounting. He did so and then allowed defendants one half the total expenses shown on the profit and loss statement of Exhibit B and, after deducting the amount of an unlisted expense item and of an item found due on machinery, arrived at a balance due plaintiffs of some $20,000. We agree, contrary to appellants' contention here, that the referee correctly could accept the amount Mason claimed as the farm's total gross receipts without adopting the rest of the accounting, and we should be willing to so do if by the use of that figure as a starting point we could proceed to arrive at a substantiated conclusion as to the status of the partnership accounts. But we are unable to discover any theory which justifies the conclusion that the farm expenses were in fact about one half the amount of the expenses stated in Mason's exhibit, nor can we find anything indicating that such would be a reasonable estimate of those expenses. We have searched the record in vain for substantiation for some theory which would justify estimating the expenses at one half the amount shown or at some other figure, or for a theory on which we may arrive

at a figure which represents even an educated "guess" as to the status of the partnership accounts among the parties.

■ We recognize the fact that the relationship among these partners was a fiduciary one, Schroer v. Schroer, Mo., 248 S.W.2d 617, 619 [1–3], and that Mason's failure to have kept proper books and records constituted a breach of that relation. We bear in mind that Mason had the duty and burden to render an accurate accounting of the partnership and in so doing he needed to establish not only the accuracy of the records he adduced but he needed also to establish the accuracy of the various accounts, including, of course, the instruments upon which those accounts were based. Bass v. Daetwyler, Mo.App., 305 S.W.2d 339, 345 [15]; Simich v. Culjak, 27 Wash. 2d 403, 178 P.2d 336, 339 [1]; Stephens v. Stephens, 298 Ky. 638, 183 S.W.2d 822, 825 [8]. We are aware also that under the circumstance here, i. e., that Mason failed to discharge his duty in the above-mentioned respects, all doubts and ambiguities connected with his purported partnership accounting should be resolved against him. Glazer v. Kurman, 384 Pa. 283, 120 A.2d 892, 894 [1]; Moore v. Malis, 292 Ky. 106, 166 S.W.2d 52, 53 [1–4]. The difficulty is, that recognizing and applying the foregoing principles and resolving all doubts and ambiguities against Mason does not enable us to arrive at a result. One insurmountable obstacle is that plaintiffs have failed to show, and defendants' evidence does not show, that a proper accounting among the parties would result in a balance due plaintiffs. For example, plaintiffs' evidence indicated that at least Garland Adams had received income from Mason most years if not every year from 1939 through 1954. Income tax returns prepared for Garland by the same accountant who testified for defendants indicated that over a period of seven years, from 1948 through 1954, Garland Adams received from Mason, one way or another, an average annual gross income of about $2,800. Furthermore, despite the inaccuracies inherent in and the invalidity

of much of the evidence on which Mason's proffered accounting was based, it appears most likely that many listed expense items were properly chargeable against this farm operation, particularly the large items covering the purchase of cattle and feed; provided, of course, that those items may be directly traced to the farm in question rather than to one of the other farms operated by Mason. We mention the foregoing only to suggest that while plaintiffs have demonstrated the inaccuracy of Mason's accounting, they have not shown that anything is, or if it is, how much (estimated or otherwise), is due them.

█ We make it clear, however, that we do not mean that Mason should be able to prevent plaintiffs' recovering what may be due them simply by failing to have kept books and records, by failing to have accurately accounted, and by remaining silent on matters of which he must have knowledge. And thus we do not mean that plaintiffs had any duty to adduce evidence from which a detailed accurate statement of the partnership operation could be made. It was impossible for them to have done so, due to Mason's failure to have kept proper records. Plaintiffs needed only to come forward with some evidence which would circumvent the necessity for a detailed accounting but which, nevertheless, would furnish a reasonable basis for an equitable adjustment of the partnership operation. Plaintiffs made no real attempt by expert testimony or otherwise to show what the average net income of that farm should have been during the period involved. It may be that it will be impossible to ever arrive at the status of the accounts among the parties. We are unwilling, however, to make that assumption at this juncture of the case.

We now consider an unexplained document in evidence as defendants' Exhibit 1, which, if explained, could be decisive on rehearing of some of the matters which have been discussed heretofore. On the profit and loss statement of Exhibit B there appeared a 1944 expense item in the amount of $9,777.37 designated as "purchases." Asked for an explanation, the accountant said he had obtained that figure from some papers furnished by Mr. Mason and, in substantiation, produced a partnership agreement dated in December 1944 signed by the Masons, William Adams and his wife, Garland Adams and his wife, and Hedge Adams. On pages 2 and 3 it was stated that a certain inventory totaling $9,-777.37, including grain, livestock, and hay, was owned by Mason and that the profit from the use of that inventory was to be disbursed in accordance with another portion of the agreement. While the exhibit was produced solely to explain the $9,777 item, it must be apparent that it purported to be an agreement among the parties for the operation of the same farm which was the subject of the July 1938 agreement. The 1944 agreement provided in detail the method by which the farm was to be financed and operated and contained, among other things, the provision that the Masons agreed to sell to Garland and Hedge Adams at any time during the term of that (December 1944) agreement the same 187.375 acres and the same additional 27.5 acres, all at the price of $87.50 per acre plus the cost of improvements, upkeep, or repairs to said acreage paid for by the Masons prior to any such sale. There was the further provision that the offer to sell at $87.50 per acre would be void at the expiration of the agreement and that the agreement terminated and superseded "all prior agreements either written or oral between said parties," and provided for termination at any time at the will of any party by written notice. We have heretofore indicated that plaintiff Mary Adams testified that she received a written notice from Mason on October 19, 1954, purporting to terminate all agreements which she (Mary Adams) "might consider in effect."

Despite the fact that the referee indicated to counsel for the parties the decisive importance he attached to that agreement, which had been brought into the picture so casually and only in substantiation of one figure in an accounting which itself was based upon the prior July 1938 partnership agreement, and despite the obvious ques-

tions that at once arose because of and concerning the 1944 agreement, none of the parties showed any inclination below to explain or embrace or explore that document or its effect. The referee concluded that he had erred in admitting the 1944 agreement on the ground that it tended to contradict the trial court's interlocutory decree based upon the partnership agreement of July 29, 1938, and, consequently, he ignored the agreement except as it explained the accountant's testimony as to the $9700 item. Strangely enough, even here appellants in their brief, while contending that the trial court erred in adopting the referee's exclusion of the 1944 agreement for the stated reason that it was evidence of the status of the partnership in December 1944, content themselves with the conclusion that the court "in accepting and approving the report of the Referee in excluding this material exhibit committed prejudicial and reversible error." They do not, in their brief, take the position that the 1944 partnership "contract" wiped out the necessity for an accounting from 1938 to 1944 or superseded the "contract" with respect to the conveyance of one half the farm. As a matter of fact, defendants admitted the validity of the July 1938 "contract" and that it was in effect in their still current joint answer filed in this case on July 11, 1955. In that answer they averred that plaintiffs' only interest in the farm was evidenced by an "option to purchase" the 187 acres in question "created by contract dated July 29, 1938." Furthermore, defendants proceeded before the trial court and the referee by accounting for the period from 1938 through 1954 apparently under the terms of the 1938 "contract," and in this court take the position that they are entitled to a judgment against the plaintiffs for the sum of $67,000 shown by the accounting based on the period beginning in 1938 and without reference or respect to the terms and provisions of the 1944 contract. Nor is there any present attempt, nor was there any attempt below, to show whether there was any consideration and, if so, what the consideration was, for the cancellation or supersession of the provision in the July 1938 contract providing that Garland Adams and his wife were entitled to receive Hedge's one half of the farm upon payment of nominal sums at any time during the lifetime of either Garland or his father, Hedge.

Were it not for the fact that we must in any event remand this case, we might well ignore the December 1944 agreement on the grounds that the parties litigant have largely ignored it and that it is questionable whether appellants would be in a position to insist that the 1944 agreement should prevent the final disposition of this case on this appeal. Inasmuch, however, as we are remanding the case, and inasmuch as it is difficult to understand how there may be a just and equitable result without a determination of the validity of and the effect, if any, of the December 1944 agreement, we shall assume that the agreement will be dealt with on remand.

 Plaintiff Hedge Adams died in July 1958. After the referee's report had been filed, the trial court sustained Garland Adams' motion to substitute himself as his father's "only son and heir." Appellants contend the trial court was without jurisdiction to make such substitution because, they say, no attempt was made to revive the action in behalf of Hedge Adams in accordance with the provisions of Section 507.100 RSMo 1959 and V.A.M.S., and that the statutory period for substitution has expired. Civil Rule 52.12 V.A.M.R. (adapted in part from Section 507.100 RSMo 1949, as amended, Laws 1957, p. 293) provides in subparagraph (a) that if "a party dies and the claim is not thereby extinguished, the court shall on motion order substitution of the proper parties." In subparagraph (c) the rule provides further that if "the death occurs prior to final judgment and before appeal and substitution or motion therefor is not made within nine months after the first published notice of letters testamentary or of administration, the action shall be dismissed as to the deceased party; * * *."

It appears that the substitution of Garland Adams as the sole heir of his father

**18**

was proper in so far as concerns the enforcement of Hedge's interest in the real estate by virtue of the "contract," but in so far as enforcing Hedge Adams' claim to any balance due him by reason of the farm accounting, his executor or administrator would be the "proper party" to be substituted. The record does not show when, if at all, the first notice of letters testamentary or of administration on the estate of Hedge Adams, deceased, was published. (We are advised by respondents, by an outside-the-record statement in their brief, that letters of administration were granted in Hedge Adams' estate on March 16, 1962.) We may not determine on the record before us whether the time for substitution of the administrator or executor, if any, has expired.

The judgment is reversed and the case remanded with directions to proceed consistently with the views herein expressed.

HOLMAN and HOUSER, CC., concur.

PER CURIAM.

The foregoing opinion by COIL, C., is adopted as the opinion of the court.

All concur.