Kerry G. KING, Appellant,

v.

Kevin BULLARD, Respondent.

No. ED 89833.

Missouri Court of Appeals,
Eastern District,
Northern Division.

June 30, 2008.

Steven E. Raymond, Shelbyville, MO, for appellant.

James McConnell, Shelbina, MO, for respondent.

KURT S. ODENWALD, Judge.

## Introduction

Kerry G. King (King) appeals from that part of the trial court's judgment[1] in favor of Kevin Bullard (Bullard) in the action King initiated against Bullard demanding an accounting, and claiming conversion and breach of fiduciary duty. We reverse and remand for further proceedings.

## Background

King filed a petition on September 23, 2004, alleging, as pertinent to the issues on appeal, that he and Bullard formed K & K Logging (K & K), a partnership in which they were equal partners. He further alleged that Bullard, while holding himself out as King's partner in K & K, wrongfully withdrew funds from the partnership in an amount greater than his share of the profits, withheld records of the partnership, incurred debts in the name of the partnership, converted income of the partnership to himself, failed to pay debts of the partnership, withdrew all funds of the partnership, closed the partnership bank account, used King's credit to incur debts for Bullard's personal use and benefit, converted partnership income and funds to himself, and committed other wrongful and injurious acts unknown to King. King claimed that, although he had made numerous demands upon Bullard to account for the sums of money taken by Bullard while Bullard was purporting to act upon King's behalf, Bullard refused to account to King or to pay any sums due to King, refused to return property of the partnership, and refused to pay any part of the debts he incurred in the name of the partnership. King further claimed that King had performed all of his partnership obligations and had been required to pay out of his personal funds checks drawn upon the partnership account for partnership expenses and debts.

In response, Bullard filed Defendant's Answers and Counterclaims, in which he admitted that he and King formed K & K Logging as an equal partnership and owed each other a fiduciary duty as partners of the partnership. Bullard denied King's other allegations, claimed he had been damaged by King's wrongful, intentional, wanton and malicious acts, and requested that King be ordered to pay him for all sums owed, costs, attorney fees, fair and reasonable compensatory or actual damages, and punitive or exemplary damages.

King and Bullard testified during a bench trial conducted on November 28, 2006. The evidence presented by both King and Bullard was often contradictory, confusing and unsubstantiated. Bullard testified that he and King entered into a partnership arrangement. Bullard knew that King provided capital when they created their partnership, but Bullard did not know the amount. King deposited $28,000 into a checking account at Community State Bank for K & K. Bullard signed a contract with King, and promised to pay

---

1. The trial court's judgment also found in favor of King and against Bullard on Bullard's counter-claim, but that portion of the court's decision has not been appealed.

$12,000 to Hilltop Wood Products, Inc. for machinery and equipment to be used in the partnership. Bullard did not know how much King paid for the equipment and machinery, and Bullard's name was not added on the titles to the equipment. Bullard thought they were purchasing a four-by-four, 26-foot lift loader, a Wood-Mizer sawmill, a band saw sharpener, a log deck, a sawdust system and various extra tools and supplies. Bullard did not know what monies King paid to Hilltop; King retained all the machinery and equipment.

King and Bullard became partners because Bullard needed a skidder for his logging operations. At the beginning, they agreed that Bullard would make a $500 monthly payment on a skidder owned by King. The motor on the skidder shortly broke down and King told Bullard that he did not have the funds to repair the machine. Bullard paid for the repairs, but charged the parts to King's account at Altorfer. Bullard later reimbursed King for the parts. Bullard paid around $5000 for the repairs and parts. Afterward, Bullard and King formed the partnership because King performed dozing work only in the summer and wanted to log with Bullard during the winter. According to Bullard, he and King agreed that they would form a partnership in which they would share the labor, income, and expenses involved in logging and dozing operations. Proceeds from the dozing operations were never deposited into the partnership account. Bullard and his helpers performed almost all of the labor for the logging operations. King's contribution of labor to the logging operations was negligible.

King maintained the partnership checking account, but King gave Bullard checks each day depending upon what Bullard had to do that day, in case Bullard "had a tire blow" or needed fuel. King was responsible for the partnership's bookkeeping and Bullard gave King all the receipts he had for expenditures. For a short period of time, Bullard used one of King's fuel cards. Bullard testified that he could not produce any receipts or cashier's checks for discovery because King kept all of the receipts and paperwork for the partnership.

During trial, Bullard identified various checks in varying amounts that were made out to and signed by him in February, March, April, May, and August 1999, with a memo of "personal account." Bullard identified several other partnership checks in different amounts that were made out to him. Bullard also identified a check, payable to Perry State Bank, written by him in the amount of $1600, which showed that $600 was to go to his account. Bullard identified a check made out to Household Finance Corporation for $215.02 and acknowledged that it was used to pay a bill for his girlfriend, and he identified two checks, payable to the City of Shelbina for $300 and $154.92, that were used to pay his utility bill. Bullard testified that both he and King paid utility bills and personal expenses out of the K & K account. Bullard identified a check, dated April 20, 1999, payable to the City of Shelbina in the amount of $300, which King wrote to pay King's utility bill.

Bullard testified that he wrote a check for $1502 to Perry State Bank for a cashier's check that he used to buy a John Deere rear-end part needed for the skidder, and that he also wrote checks to Perry State Bank in the amount of $1,840.40 and $400 as payment for personal debts. Bullard testified that he wrote checks to various vendors including Casey's, Midwest Tire, Air Co., Orscheln's, Tallman's Tire Service and Sam's Auto Parts in varying amounts. Some of the checks were for personal use and others were written for

partnership activities, in particular for fuel, parts and repair.

Bullard identified two checks that King wrote to him as payment for his labor, one for $300, dated July 30, 1999, and another dated August 20, 1999, in the amount of $100. Bullard testified that he and King often would write checks, sign them and hand them back to the other. Bullard sometimes used cash to pay business expenses, such as lunch for his workers, gas and parts for chainsaws, and diesel fuel for equipment.

Bullard identified a deposit slip showing that a check in the amount of $2745 was presented, with $145 received in cash. Bullard acknowledged that he received the money, but did not know the purpose for which he used it. Bullard did not recognize several deposit slips that were presented with cash received, but believed they must have been King's because the deposit slips were not in Bullard's handwriting and King made most of the deposits. These deposit slips showed various amounts of cash being received, including $1000 on May 25, 1999, and $400 on May 10, 1999.

Bullard identified two cash withdrawal slips bearing his signature, one for $100 on May 11, 1999, and one for $100 on May 24, 1999. He testified that the withdrawals were "probably not for personal; probably for fuel or gas tickets." Bullard identified a withdrawal slip, dated September 24, 1999, where he withdrew $809.49 and closed the account; however, $101.82 of that money was directly deposited back into the account to pay outstanding checks. Bullard stated that he closed the account because King kept writing checks to Hilltop and other individuals, which required Bullard to keep working because he was liable for payment of those checks, and the partnership was over. Bullard admitted that he cashed a $1600 logging proceeds check because he could not pay his rent. Both Bullard and King would cash proceeds checks, always with the knowledge of the other partner. Bullard testified that he always told King when he received money, so King was always aware when Bullard received cash from deposits.

After the partnership was concluded, Bullard testified that he continued to pay several partnership claims, including a debt of $3500 to Ray Hillman and a settlement with Mr. Latchford for $1600. Although Bullard believes King owes him money from the partnership operations, he does not have any receipts or records, and he has no knowledge of what King earned on his dozing.

King, who owns a bulldozing business, testified that Bullard and another man had rented a skidder from him prior to February 11, 1999. After they returned the skidder to King, Bullard approached King to rent the skidder and agreed to pay $500 weekly and to return it in as good or better shape than when he received it. Sometime thereafter, King entered into an agreement with Bullard to form a logging operation, K & K.

King testified that after he and Bullard agreed to create the partnership, King borrowed $28,000 to buy a forklift to load logs. King opened the partnership checking account with this money, but immediately wrote a check to Hilltop Wood for $21,000 to purchase various items of machinery and equipment. The total purchase price was "32,000–something[,]" so King gave Hilltop a promissory note for $12,000.

King kept the checkbook for the partnership checking account at his house. Although there were some payments made from the partnership account to Hilltop and to the bank from which King borrowed from the partnership account, King

paid off the balance of the $28,000 personally after Bullard closed the account. King still owns the machinery and equipment, which he estimates to be worth between $10,000 and $12,000.

King testified that he kept the income he earned and the expenses incurred by his dozing business separate from K & K. However, when questioned about fuel expenses he had listed on a summary prepared for trial, King first said fuel expenses for his dozing business were included, but then stated, "The $3,600 after the account was closed, some of that could be the dozing, but I paid enough through the years that I think it will offset that." When questioned about the account he had with Altorfer Machinery and asked if some of the money paid from the partnership account could have been expenses connected with his dozing business, King replied, "After like, the month that [Bullard] charged the parts to me, there was also parts for dozing on there too. It was all mixed in the invoice numbers, and I've never tried to straighten that out till the end." Later, regarding the Altorfer bills, King said "... I never did completely separate every single item. It's too hard to figure out." King admitted that Bullard sometimes ran the dozer for him, but that neither Bullard nor King's son kept track of the hours. When questioned about a check written for steel tracks and asked if that could have been a dozer expense, King answered, "Now you've got me wondering. I don't know what it was for. That won't buy even a pad on the dozer, so I don't know what it was for." He also identified a check written on April 5, 1999, showing $2500 going into his dozer account from the partnership account and said, "Yes, that'd be to reimburse my account."

King admitted that some of the items included in the expense summary submitted to the trial court and some of the receipts and checks submitted at trial were for expenses incurred before K & K existed, including a $2928 bill from Hawkins Brothers, dated January 13, 1999; a $59.78 bill from Auto Zone, dated January 15, 1999; two receipts from Hardy Oil, dated January 9 and January 14, 1999; a check to Marion County Implement, written on January 19, 1999, for tire repairs; a check, dated October 31, 1998, for a radiator repair; and a January 26, 1999 receipt from the Department of Revenue for licensing a log trailer that belonged to King. King also admitted that his summaries and receipts included a charge from Lucas Hardware that was incurred after the partnership ended and "probably shouldn't be in there." He identified a check, dated December 30, 1999, which was written to pay for the patching of tires on a lowboy trailer. King said that, although the flats occurred in December, K & K had agreed to pay for the tires.

King testified that, although Bullard told him of his need for cash to operate the business, King did not know how Bullard spent the cash he received from the partnership. King testified that he asked Bullard for receipts for cash expenditures, but that Bullard brought very few to him. King stated that, on one occasion, King received a check for some amount around $2000 as payment for logs and he thought he gave Bullard a check for $1000 out of his personal checking account and kept the other half in partial payment of skidder rent owed to him by Bullard. When asked why he continued to give money back to Bullard when Bullard owed him for the pre-partnership repair bill and skidder rent, King said that the money was due to Bullard for a log job that had used King's skidder and that Bullard needed money to

operate and to take care of his children, so King "took half, called it rent."

When asked whether he received cash back from the partnership account to repay himself, King replied, "At times, I would write myself a check, or we would agree—" King identified several checks written to himself and admitted that, on occasion, he or Bullard would write checks out to themselves for cash in order to pay employees or individuals for their logs in cash. When asked if he had been reimbursed for any of the checks he had listed in one of his exhibits, King answered, "It depends on if I took any money out of K & K at all through this whole procedure, from, say, October 1998[,] clear up to September 24th, when he closed the account. I guess if I took this money, and it went to me, you could say some of those are paid, because some of them's pretty old." He added, "But I don't know which ones would be considered paid." When shown some checks included in his exhibits that were written to Orscheln's and asked if he had been reimbursed for those checks, King said, "All I can say, I guess, is, I don't know if I really got reimbursed for those specific checks." He then elaborated, "I testified I'm still owed money, quite a bit, but I don't know which ones you want to call paid or unpaid. All I know is all of them here are paid in full mainly by me after the account was closed." King identified a check written to him with the memo notation of "parts payback," and when asked what he would have done with the expense documentation, he replied, "They could have been cash tickets that I didn't even keep. I don't know."

King identified a check, dated February 20, 1999, in the amount of $120 that was used to pay his cell phone bill.

King testified that Bullard did not tell King of his intention to close the partnership checking account before he did so and that King personally paid some of K & K's expenses after Bullard closed the partnership checking account. The night before the hearing, King and his attorney prepared a summary of the pre-partnership damages, advance loans to Bullard, and expenses he personally paid. He testified that K & K was responsible for paying the insurance, license fees and fuel for a lowboy tractor he owned but that also was used by K & K for hauling logs. King said that in connection with a claim one individual had against K & K, King paid the man making the claim, and also absorbed a dozing bill that the man otherwise owed him personally.

In its judgment, the trial court found the following, as pertinent to this appeal. King and Bullard agreed that they orally contracted to form a partnership to conduct logging operations in February 1999 and that they operated the partnership until September 1999, when Bullard closed the partnership checking account and withdrew the account's balance.[2] Most of the equipment used by the partnership was purchased with proceeds from a loan taken out by King and most, if not all, of the labor for the partnership was performed by Bullard, assisted at times by employees. Neither partner kept books of account, and the partnership's records consisted mainly of bank account statements, deposit slips, and cancelled checks.

Based upon the evidence presented, the trial court further found that both parties made deposits to the partnership checking account from proceeds of the logging operations; cash was withheld from deposits

**2.** While there was some question as to the scope of the intended partnership activities, in particular, whether the partnership was to include King's bulldozing business, both parties clearly acknowledged the existence of a partnership arrangement between them.

made by both partners; and personal expenses of both partners, unrelated to the logging operations, were paid from partnership funds. The trial court found credible Bullard's testimony that cash Bullard withheld from deposits was sometimes used to pay for such partnership-related expenses as employee meals, equipment repairs and fuel, but the court also concluded that the lack of record-keeping made it impossible to determine how much of the cash withheld from deposits was used for partnership purposes.

The trial court acknowledged the right of each partner to an accurate accounting as requested, and the corresponding obligation of each partner to accurately account to the other by presenting such information and evidence as would enable the court to get a true, accurate, and complete picture of the partnership's financial history. However, the trial court held that the evidence presented was so "hopelessly conflicting, confusing, and incomplete" that the court could not render an accounting without resorting to speculation and conjecture. The trial court concluded that neither partner had fulfilled his obligation to the other to accurately account for his receipts and expenditures of partnership property and that the partners' failure to keep accurate, complete books and records of the partnership's income, expenses, disbursements, and capital contributions resulted in the trial court's inability to settle the accounts pursuant to Section 358.400, RSMo 2000.[3] The trial court granted judgment to Bullard and against King on King's claims and in favor of King and against Bullard on Bullard's claims. The court assessed costs to King.

This appeal follows.

### Points on Appeal

King raises two points on appeal. In his first point, King claims the trial court erred and abused its discretion in entering a judgment purportedly resolving all claims in the case without ordering an accounting because the judgment erroneously declared and misapplied the law entitling each partner to an accounting. King further argues that the trial court's judgment is not supported by substantial evidence because each partner admitted, and the trial court found, the existence of a partnership, which gives each partner the right to an accounting, which is required to settle the partnership accounts and affairs under the Uniform Partnership Act.

In his second point, King claims the trial court erred in entering judgment against him on each count of his petition because the judgment erroneously applies the law requiring an accounting, is not supported by substantial evidence, and is contrary to the weight of the evidence. Because we reverse and remand this matter for further proceedings under Point I, we need not address the issues raised by King under Point II.

### Standard of Review

Our standard of review in this court-tried case follows the principles set forth in *Murphy v. Carron*, 536 S.W.2d 30 (Mo. banc 1976). The trial court's decision will be affirmed on appeal unless no substantial evidence supports it, it is against the weight of the evidence, or it erroneously applies the law. *Id.* at 32. The power to set aside a trial court's judgment on the ground that it is against the weight of the evidence will be exercised with caution and only when the reviewing court has a firm belief that the judgment is wrong. *Thomas v. Lloyd*, 17 S.W.3d 177, 182 (Mo.App. S.D.2000), *citing Searcy v. Seedorff*, 8 S.W.3d 113, 116 (Mo.1999). "In reviewing

---

**3.** All subsequent statutory references are to RSMo 2000, unless otherwise indicated.

a contention that the evidence is insufficient, the evidence is viewed in the light most favorable to the verdict, and deference is accorded to the trial court's assessment of credibility."[4] *Id.* The Court of Appeals will defer to the trial court's judgment in a bench-tried case even if the evidence could support another conclusion. *Legacy Homes P'ship v. Gen. Elec. Capital Corp.*, 50 S.W.3d 346, 356 (Mo.App. E.D. 2001).

## Discussion

In his first point, King argues that the trial court abused its discretion in entering the Judgment without ordering an accounting. Specifically, King asserts that each partner has a right to an accounting, without which settlement of the partnership affairs and accounts cannot be accomplished. King argues that the trial court's finding of the existence of a partnership between him and Bullard mandated that the court render an accounting in order that the partnership's accounts and affairs could be settled as required by the Uniform Partnership Law, Chapter 358 of the Revised Statutes of Missouri.

Missouri law provides that each partner has a duty to "render on demand true and full information of all things affecting the partnership to any partner...." Section 358.200. Pursuant to Section 358.210.1, "[e]very partner must account to the partnership for any benefit, and hold as trustee for it any profits derived by him without the consent of the other partners from any transaction connected with the formation, conduct, or liquidation of the partner-

ship or from any use by him of its property." Section 358.210.1. Coupled with the duty to account is a partner's right to receive a formal accounting from his or her co-partners. Section 358.220.

Section 358.220 sets forth the circumstances under which an accounting may be had. Under Section 358.220, any partner has the right to obtain a formal account as to partnership affairs:

(1) If he is wrongfully excluded from the partnership business or possession of its property by his copartners;

(2) If the right exists under the terms of any agreement;

(3) As provided by section 358.210;

(4) Whenever other circumstances render it just and reasonable.

The right to demand an accounting is not absolute, but is premised on these four provisions. At the heart of King's demand for an accounting are the rights accorded under Sections 358.220(1) and (3), whether King has been wrongfully excluded from possession of partnership property by Bullard, and whether Bullard has derived any profits without the King's consent from any transaction connected with the formation, conduct, or liquidation of the partnership.[5] In his petition King alleged that Bullard, while holding himself out as King's partner, wrongfully withdrew funds from the partnership in an amount greater than his share of the partnership's profits. This allegation, if proven, would entitle King to a formal accounting of the partnership's affairs pursuant to Section 358.220.1. While the trial court duly noted

---

4. Note that in earlier cases, the Missouri Court of Appeals stated that in a suit for accounting, the Court of Appeals has the duty to review the case de novo. *Bass v. Daetwyler*, 305 S.W.2d 339, 343 (Mo.App.1957), *citing McKinley v. Durbin*, 231 S.W.2d 286, 290 (Mo.App.1950).

5. No written agreement exists to govern the partners' relationship, and the evidence as to the terms of the partnership's oral agreement is either nonexistent or conflicting. Thus, no right to an accounting was proven to exist under the terms of any agreement as required by Section 358.220.2.

the difficulties of resolving doubts and ambiguities relating to its ability to render and accurate accounting, this challenge does not relieve the parties or the court of their respective obligations to render an accounting once the statutory requirements of Section 358.220 are met.

In its Judgment, the trial court found not only that King and Bullard formed a partnership, but that each partner had the legal right to an accurate accounting from his partner and the corresponding obligation to accurately account. Although the trial court did not expound on its reasoning, it is implicit in this finding that the court determined the parties had presented sufficient evidence to support the requirement of a finding under Section 358.220. As noted above, we accord great deference to the trial court's assessment of credibility of the witnesses, and defer to the trial court's judgment in a bench-tried case unless it is against the weight of the evidence. *Thomas*, 17 S.W.3d at 182; *Legacy Homes P'ship*, 50 S.W.3d at 356.

While the trial court found the necessary prerequisites under the statute that obligated both King and Bullard to provide an accounting to each other, the trial court duly noted that neither King nor Bullard fulfilled his obligation to the other to accurately account for the partnership's capital, receipts, property, or expenditures. Neither party kept complete records of the partnership's activity. Both parties treated the partnership's funds as their personal funds. The partners disagreed as to the interpretation of the indefinite financial information that was presented to the trial

court. The trial court found that failure of the parties to provide it with complete, accurate and understandable information relating to the financial history of the partnership made it impossible for the court to render an accounting without resorting to speculation and conjecture. We disagree.

 It is well-established in Missouri that an action for accounting proceeds in two stages.[6] *State ex rel. Rowlett v. Wilson*, 574 S.W.2d 376, 378 (Mo. banc 1978). First, the trial court determines whether the party seeking an accounting is entitled to such relief. *Buffington v. Green*, 221 Mo.App. 695, 285 S.W. 531, 535 (1926). If so, the court will enter an interlocutory order establishing that party's right to an accounting. *Fleahman v. Fleahman*, 25 S.W.3d 162, 164 (Mo.App. E.D.1999); *Buffington*, 285 S.W. at 535. Only if the court determines that such right exists will it proceed to the second stage of the actual accounting. *Fleahman*, 25 S.W.3d at 164. However, a trial court does not necessarily err if it proceeds to an accounting before establishing the responding party's liability to account.[7] *See Thomas*, 17 S.W.3d at 188; *Patton v. Goodson*, 238 Mo.App. 439, 183 S.W.2d 333, 337 (1944).

 Here, the trial court completed the first stage of the parties' claim for accounting by finding that a partnership exists and that each partner has a corresponding obligation to accurately account to the other. Given this express finding, it is then incumbent upon the trial court to proceed with the second stage of the accounting

---

6. "The use of a two-stage trial in an 'accounting' lawsuit is a 'rule of practice developed by the courts to spare a defendant the trouble and expense of preparing unnecessarily for and then trying an accounting which may or may not be ordered.'" *Thomas*, 17 S.W.3d at 188, *citing State ex rel. Rowlett v. Wilson*, 574 S.W.2d 376, 378 (Mo. banc 1978).

7. For example, in *Thomas v. Lloyd*, the Court of Appeals held that defendant could not complain about the denial of a bifurcated trial where defendant had sought an accounting from plaintiff and plaintiff did not complain about the trouble and expense of preparing an accounting before the court established her liability to account. 17 S.W.3d at 188.

proceeding. *Wilson*, 574 S.W.2d at 378. While this task may be daunting, it is a task incumbent upon the trial court to undertake given its aforementioned findings.

■ The failure to keep proper books and records constitutes a breach of the fiduciary relationship that exists between Bullard and King as partners. *Adams v. Mason*, 358 S.W.2d 7, 15 (Mo.1962). However, a partner should not be precluded from recovering what is due him or her because the partnership failed to keep accurate books, records, receipts and the like. *Id.* at 16. Particularly frustrating in this case is that the failure to maintain accurate books and accounts seems to fall at the feet of Appellant King, who now claims that the morass of checks, receipts, and bank statements offered into evidence with little or no explanation was sufficient to allow the trial court to somehow divine to what partnership activities, if any, these documents purportedly pertained. Despite the absence of a detailed accounting, the parties each offered evidence of their respective contributions to the partnership, income and expenses and receipt of monies from the partnership. While it may be impossible for either King or Bullard to provide the detailed accounting required of them given their fiduciary obligations to each other, the trial court is capable of deciding whether the evidence presented at trial provides a reasonable basis for an equitable adjustment of the partnership. *Id.* at 16. Moreover, since the evidence here indicates that King failed to discharge his duties to maintain accurate books and records, it falls within the trial court's discretion to resolve any doubts or ambiguities as to the partnership accounting against King. *Id.* at 15.

Although we understand and empathize with the trial court's frustration in the partners' failure to keep accurate and complete books and records of income, expenses, disbursements and capital contributions, we disagree with the trial court's reaction to their shortcomings. The trial court seems to have thrown up its hands in frustration, and as a result, failed to discharge its responsibilities in the second stage of the accounting requested by both partners. The record amply demonstrates the challenges presented to the trial court in rendering a final detailed accounting of the partnership. However, we believe the record provides sufficient information from which the trial court can assess the weight and credibility of the evidence presented, and establish a reasonable basis for an equitable adjustment of the partnership. The trial court's judgment denying an accounting is against the weight of the evidence, which shows the existence of a partnership and the obligation of the partners to make an accounting under Section 358.220. Point granted.

Because we grant Appellant's first point and remand this matter to the trial court for further proceedings, Appellant's second point is moot and will not be considered.

*Conclusion*

The judgment of the trial court is reversed and the case is remanded to the trial court for further proceedings consistent with this opinion.

PATRICIA L. COHEN, C.J., and ROBERT G. DOWD, JR., J., Concur.