William J. KNOPKE, et al.,
Respondents/Appellants,

v.

Julian KNOPKE, et al.,
Appellants/Respondents,

v.

Marcella M. KNOPKE, Personal
Representative, Respondent.

Nos. WD 44416, WD 44444.

Missouri Court of Appeals,
Western District.

June 30, 1992.

Motion for Rehearing and/or Transfer to
Supreme Court Denied
Sept. 1, 1992.

Application to Transfer Denied
Oct. 27, 1992.

Duane J. Fox, Kansas City, for respondents/appellants.

Richard W. Miller, Kansas City, for appellants/respondents.

Dennis James C. Owens, Kansas City, for respondent.

Before KENNEDY, P.J., and FENNER and BRECKENRIDGE, JJ.

KENNEDY, Presiding Judge.

Beginning in 1946, brothers Julian Knopke, Richard E. Knopke and Roman Knopke conducted a construction equipment supply business as a corporation by the name of Contractors Supply. In 1959, the three brothers formed a limited partnership named "Knopke Brothers," with themselves as general partners. The partnership was capitalized with total contributions of $48,475 from the three brothers. The limited partners were: a fourth brother, William J. Knopke, and trusts of which the respective children of general partners Julian, Richard E., and Roman, were beneficiaries. A primary, or perhaps the sole reason for the arrangement was to divert income to the children of the general partners, whose income would be taxed at lower rates. Knopke Brothers, the limited partnership, engaged in the rental and sale of light construction equipment to contractors. It is not clear whether this was a spin-off of a business previously operated by Contractors Supply, or was a new venture. Rentals appear to have been the chief source of income for the partnership, with sales contributing only secondarily.

This case grows out of the dissolution of the limited partnership in 1980.

Contractors Supply and Knopke Brothers conducted their respective businesses on parallel tracks. The two businesses were operated on the Contractors Supply premises in Kansas City and Springfield, Missouri. To their customers they presented a single identity, that of Contractors Supply. Contractors Supply did the billing and collecting for the rental and sale of Knopke Brothers equipment. We do not find that Knopke Brothers had separate printed stationery of any sort. Apparently, it had no separate bank account. The property, income and expenses of the two businesses, however, were segregated both physically and on the records maintained on the premises. The property of the two businesses was not commingled to the point of losing its identity. Where expenses were attributable to both businesses, an effort was made to divide them on some sort of scientific basis. An example of the affiliation of the two organizations is found in their dealing with certain compressors, which plaintiffs claim the partnership owned and Contractors Supply converted at the time of

the dissolution of the partnership, and of which a more detailed explanation will be given later in the opinion. Contractors Supply as a distributor of Gardner–Denver compressors bought the compressors from Gardner–Denver. It sold, or consigned, the compressors to the partnership at a profit. The purchase price was to be paid by the partnership to Contractors Supply from the rentals collected by the partnership, or from the proceeds of the sales of the compressors. Contractors Supply then on the partnership's behalf rented the compressors to contractor customers, sent out bills for the rentals, and collected the rentals. Eighty percent of the rentals would be retained by Contractors Supply to be applied on the unpaid price of the compressor owing by the partnership to Contractors Supply. Twenty percent would go to the partnership.

There was maintained by Contractors Supply an "intercompany account" by which all transactions between Contractors Supply and the partnership were controlled. When money was collected by Contractors Supply on partnership accounts, this was shown on the intercompany account as an account receivable by the partnership, and as an account payable by Contractors Supply. Moneys owing from the partnership to Contractors Supply were credited against the sum of the partnership's accounts receivable from Contractors Supply. This intercompany account, during a five-year period before the dissolution of the partnership, consistently showed a large balance in the partnership's favor, beginning with $135,434.79 in January, 1975, and ending with $773,534.99 at time *of dissolution. These transactions give a fair idea of the relationship between the partnership and Contractors Supply. The*

partnership was an adjunct of Contractors Supply, and in some sense a captive customer of a benign captor or, by plaintiffs' lights, an exploitive captor.

The interests of the beneficial owners of the two entities were at first identical, or practically so. As the years passed, though, their interests began to diverge. General partner Roman Knopke died in 1975. Richard E. Knopke sold his interest in 1979, leaving Julian as the only general partner. Richard E. Knopke's sons sold their limited partnership interests at the same time. At the time of the dissolution of the partnership, the plaintiff group[1] among themselves—that is, all the limited partners except Julian Knopke and his three sons and Contractors Supply, the defendant group—owned limited partnership interests totalling 50 percent of Knopke Brothers, and owned no part of Contractors Supply. Julian Knopke and his sons, on the other hand, owned virtually 100 percent of Contractors Supply shares, and 50 percent of the limited partnership Knopke Brothers. Julian himself owned more than 50 percent of Contractors Supply stock, and was chairman of the board of directors. He owned only a 7½ percent interest in Knopke Brothers, but was its sole general partner. Richard J. Knopke, one of Julian's sons, was the president of Contractors Supply and seems after 1975 to have directed the operation of Contractors Supply and Knopke Brothers, although subject to the oversight and direction of Julian Knopke in whom the actual governing power resided.

In October, 1979, Julian Knopke resigned as general partner effective January 31, 1980. Under the terms of the partnership contract, this resignation forced a dissolu-

---

1. The plaintiffs and their respective limited partnership interests are:

| | |
|---|---|
| William J. Knopke | 10% |
| Carol Triplett | 5% |
| Linda McGraw | 5% |
| Janis E. Gisler | 5% |
| R.A. Knopke Trust, (Eileen Knopke, beneficiary) | 15% |
| Gregory Knopke | 2.5% |
| United Missouri Bank of Kansas City, Trustee of Knopke Trust No. 12, Knopke Trust No. 13 and Knopke Trust No. 14, (Christopher Knopke, Daniel Knopke, and Susan Knopke, beneficiaries of 2.5% interest each) | 7.5% |

The defendants and their respective limited partnership interests are:

| | |
|---|---|
| Julian Knopke | 7.5% |
| Richard J. Knopke | 7.5% |
| David Knopke | 7.5% |
| Don Knopke | 7.5% |
| Contractors Supply | 20% |

tion of the partnership. The dissolution took place mainly during 1980.

The assets of the partnership at the time of dissolution, according to the books of the partnership, consisted of the balance in the intercompany account ($773,534.99) and inventory of rental equipment with a book value of $306,186.48. These were duly distributed, in a manner that will be described later in this opinion. The lawsuit we have before us were additional claims by plaintiffs on behalf of the partnership and on their own behalf, growing out of the operation, management and dissolution of the partnership.

The trial court appointed a master to hear the evidence and report to the court. After extended evidentiary hearings in November and December of 1989, the master submitted a report with detailed and orderly Findings of Fact, Conclusions of Law and Recommended Decisions on each count. The trial court after a hearing adopted the report, with some modifications, and on December 28, 1990, entered judgment thereon.

### JUDGMENT.

Those parts of the resulting judgment from which one or both the parties have appealed are as follows:

The partnership has judgment against Contractors Supply and Julian Knopke for $175,594.44 interest on the balances in the "intercompany account."

The partnership has judgment against Contractors Supply and Richard J. Knopke for $1.00 nominal damages for the conversion of 60 compressors, for $150,000 punitive damages against Contractors Supply, and $15,000 punitive damages against Richard J. Knopke.

The individual plaintiffs have judgment against Contractors Supply and Julian Knopke for $97,042, an amount improperly deducted by Julian Knopke and Contractors Supply as depreciation from rental received for partnership property from January 30, 1980, to September 12, 1980. (This is the only claim which is not a derivative claim. It is based upon a contract, dated September 5, 1980, by which the plaintiff group purchased the partnership tangible personal property from the partnership.)

The partnership has judgment against Contractors Supply for $80,514.84, representing net rental received by Contractors Supply on converted compressors from February 1, 1980, through December 31, 1983.

The partnership has judgment against Julian Knopke for attorney's fees paid to Richard W. Miller and the law firm of Miller and Glynn from partnership funds between February 1, 1980, and September 16, 1981, in the sum of $61,887.18.

The partnership has judgment against Julian Knopke for $42,670.80, representing 90 percent of the expenses of an audit of partnership affairs from February 1, 1980, to September 12, 1980. (The amount of this recovery by the partnership was directed to be distributed 75 percent to plaintiffs and 25 percent to defendants.)

The individual plaintiffs have judgment against the partnership for attorney fees and expenses in the sum of $261,694, for services in pursuing the claims for the partnership. The trial court denied plaintiffs' claim for litigation expenses, other than attorneys' fees, of $51,174.48.

All the awards bore prejudgment interest except the punitive damages awards and the award of plaintiffs' attorneys' fee.

The court denied any relief to defendants on their cross claims against Richard E. Knopke, represented in the lawsuit by Marcella Knopke, his personal representative.

### APPOINTMENT OF MASTER AND MASTER'S REPORT.

The first question we must deal with is Contractors Supply's contentions that the trial court's reference to a master was overbroad; that the master exceeded his authority under the order of reference; and that the trial court erred in refusing to grant defendants a hearing on their objections to the master's report as provided by Rule 68.01(g)(3).

This point is rejected.

■ In the first place, the circuit judge's order of January 21, 1987, was couched in the broadest terms. It referred to the mas-

ter "to hear and examine all matters at issue and to make a just, impartial and true report." It went ahead to say, "The master shall have and exercise all powers authorized to be given under the provisions of Rule 68.01 and shall have and shall exercise the power to regulate all proceedings in every hearing before him and to do all acts and take all measures necessary or proper for the efficient performance of his duties under this order." The order gave to the master those powers delineated in Rule 68.01(e). The master's hearings, rulings and report were within the warrant of the order of appointment.

■ Defendant's complaint of the impropriety of the plenary reference of January 21, 1987, comes too late. Defendants never made an objection to the reference in the trial court. We will take no notice of the objection appearing, as it does, for the first time on appeal.

Defendants did register an objection to the trial court's recommitment to the master for consideration of punitive damages and attorney's fees. This recommitment and objections thereto came about as follows: Hearings before the master under the original reference order commenced on November 2, 1987. The master's original report was filed October 27, 1988. On a March 3, 1989, hearing on the parties' objections to the original report, the trial court recommitted the matter to the master for further hearing and evidence on the subjects of plaintiffs' attorney's fees and upon punitive damages. On March 17, defendants filed their "Motion to Reconsider Recommitment to Master."

■ We reverse the award of punitive damages, which takes that part of defendants' objection out of the case. As to the plaintiffs' attorneys' fees, that subject could best be dealt with by the master before whom the main part of the case had been tried. The court was well within its discretionary authority under Rule 68.01 in referring the attorneys' fee issues to the master.

■ Defendants say they were denied due process of law when the court refused to grant them an evidentiary hearing on the master's report. Rule 68.01(g)(3) requires the court to conduct a hearing if there are objections to the recommended decision of the master. The trial court did have a hearing at which the parties argued their respective positions with respect to the various recommendations of the report. While Rule 68.01(g)(3) allows the court to receive evidence upon such hearing, the matter of receiving evidence is left to the trial court's discretion. *R.J. v. S.L.J.*, 732 S.W.2d 574, 576 (Mo.App.1987). The appellants' brief does not tell us specifically what their evidence would have been, had they been allowed to present it. We have located in the record a written request to present additional evidence to the court. The brief in this court does not tell us, though, either in the point relied on or in the argument, how the proposed evidence, or which part of it, would have aided defendants' case, and how the court erred in declining to hear it. We find no abuse of the trial court's discretion in declining to hear additional evidence.

Defendants' point is denied which relates to the appointment of the master, the scope of the master's authority, and the denial of an evidentiary hearing by the court before adopting the master's report as modified.

## INTEREST ON INTERCOMPANY ACCOUNT.

The trial court adopted the master's recommendation that the partnership have judgment against Contractors Supply and general partner Julian Knopke for interest on the balance in the "intercompany account" owing from time to time by Contractors Supply to the partnership over a period beginning January 1975 to December 31, 1980. The amount of interest was calculated to be $175,594.44, at a 9 percent annual rate, simple interest. The addition of $142,231 interest after December 31, 1980, to date of judgment December 28, 1990, increased the total to $317,825.44.

Both plaintiffs and defendants appeal from this portion of the judgment. The defendants, not denying there was a substantial balance owing from Contractors Supply to the partnership at all times during the five-year period in question, still

deny they owe the partnership any interest at all. Plaintiffs, on the other hand, claim the interest rate should have been the going market rate during the period, which was considerably above 9 percent.

First, to take up Contractors Supply's and Julian Knopke's argument that no interest was owing: They say the limited partnership contract gives to the general partner, or partners, the "unqualified authority" to make all decisions relating to the financial affairs of the partnership. Such a grant of plenary authority is always subject to the fiduciary obligations of the general partner, who must deal prudently and honestly with the partnership and other partners, 59A Am.Jur.2d *Partnership*, § 1333 (1987), and must within the bounds of discretion invest surplus partnership funds so as to make a reasonable return. Restatement (Second) of Trusts, § 181 (1957). We cannot say the court was wrong in adopting the recommendation of the master that general partner Julian Knopke be held liable along with Contractors Supply for the interest on the intercompany account balances.

While Julian Knopke's liability to the partnership stands on a breach of his fiduciary responsibility toward the partnership, Contractors Supply's liability stands on an entirely different footing. Contractors Supply had the use of substantial sums of money during the five-year period. The value of the use of the money was diverted from the partnership to Contractors Supply. Upon principles of equity, to avoid unjust enrichment of Contractor Supply, equity will imply a contract for the payment of interest. *Boyle v. Crimm*, 363 Mo. 731, 253 S.W.2d 149, 157 (1952); 45 Am.Jur.2d *Interest & Usury*, § 38 (1969).

Julian Knopke and Contractors Supply say, however, that it was agreed that no interest be charged. This they infer from the fact no interest was in fact ever charged, and that the limited partners never called attention to the fact no interest was being charged, and never complained that no interest was being charged. This argument cannot prevail, for Julian

Knopke as general partner, in observance of his fiduciary responsibility to the partnership, should himself have demanded that Contractors Supply pay interest on the amounts owing to the partnership.

Contractors Supply says it furnished to the partnership a variety of valuable services which furnished the consideration for its withholding interest on the intercompany account. There is a good deal of evidence, though, which was accepted by the master and by the court, that the partnership bore its share of expenses for services furnished by Contractors Supply. Even if that were not the case, we find no evidence that either Contractors Supply or the partnership intended that the services were rendered or accepted as consideration for the use of the funds.

Julian Knopke's and Contractors Supply's appeal from the part of the judgment awarding interest on the intercompany account is denied.

We turn to the partnership's appeal from the portion of the judgment awarding interest on the intercompany account. The partnership claims the interest rate should have been the market rate prevailing during the time Contractors Supply withheld interest, rather than the 9 percent legal rate prescribed by § 408.020, RSMo and, further, that the interest should be compounded yearly. We reject both claims.

We do not hold that a trial court is limited in every equity case to the statutory rate of legal interest, nor to simple interest. The trial court in an equity case has discretion, in certain cases, both as to rate of interest and as to compound as opposed to simple interest. In our recent case of *Palmer v. Palmer*, 805 S.W.2d 326 (Mo.App.1991), we affirmed a judgment which provided for compound interest in favor of a withdrawing partner against a partnership against the partnership's contention that § 408.020 was controlling and that the interest should have been only simple interest. In this case, however, the trial court, following the master's recommendation, awarded interest at the legal rate of 9 percent, *Leggett v. Missouri State Life Insurance Company*, 342 S.W.2d 833, 931–32 (Mo. banc 1960), and declined to

compound it. Apparently the trial court did not view the conduct of Contractors Supply or Julian Knopke as that character of aggravated conduct which justified the annual compounding of interest. *See Buder v. Fiske*, 174 F.2d 260, 274–75 (8th Cir.1949); 45 Am.Jur.2d *Interest & Usury*, § 80 (1969). We note, further, that Contractors Supply's actual gain from the use of the funds is highly speculative. We are unable to say the trial court abused his discretion in awarding the partnership interest on the intercompany account at the legal rate specified by § 408.020, and in declining to compound the same. It is to be noted that the legal rate of interest would have prevailed if the going market interest rates had been below the legal rate rather than above. *Leggett*, 342 S.W.2d at 931–32.

With respect to interest on the intercompany account for the 1975–1980 period, the judgment is affirmed as against the appeals both of plaintiffs and defendants.

### CONVERSION OF COMPRESSORS.

At the time of the dissolution of the partnership on January 30, 1980, the partnership had possession of 60 unleased compressors. Contractors Supply appropriated them. We use the word "appropriate" to describe what happened, for the alleged conversion was only a bookkeeping transaction, unaccompanied by any physical movement of the compressors. Contractors Supply, which had been leasing out the compressors on the partnership's account, began on February 1, 1980, to lease the compressors on Contractors Supply's account. The compressors were located on premises used by both Contractors Supply and Knopke Brothers. The partnership says this appropriation was unlawful and amounted to a conversion. Contractors Supply, on the other hand, claims it had title to the compressors under a "consignment" arrangement, and that it had the right under the consignment arrangement to repossess the compressors to protect the unpaid invoice price still owing to Contractors Supply by the partnership. The master, and the court, found for the partnership. Following is a history of the compressors:

The 60 compressors were among a larger number of compressors which had been sold by Gardner–Denver to Contractors Supply over a period of years on a floor plan financing arrangement. In 1976, Gardner–Denver complained of Contractors Supply's practice of transferring the compressors to Knopke Brothers, on the ground the transfers freed the compressors of Gardner–Denver's floor plan liens. Gardner–Denver would not thereafter allow Contractors Supply to sell the compressors to the partnership before Gardner–Denver was paid in full. With Gardner–Denver's knowledge and approval, Contractors Supply began simply to "consign" the compressors to Knopke Brothers. A typical invoice to Knopke Brothers would have typed thereon: "CONSIGNED TO— Knopke Bros." Then would follow a description of the compressor, with the price. The sale price included a profit for Contractors Supply. The printed invoice was a form used for ordinary sales of equipment by Contractors Supply to a purchaser, and used sale terminology throughout, except for the words "CONSIGNED TO—" noted above. The intention of Contractors Supply was to retain title to the compressors, in order to comply with Gardner–Denver's requirement that title to the compressors not be transferred from Contractors Supply until the purchase price was paid in full.

The 60 compressors claimed by Knopke Brothers to have been converted by Contractors Supply had been purchased by Contractors Supply from Gardner–Denver from time to time during the years 1976–1979 for an amount plaintiffs estimate to have been $250,000–280,000, but the evidence would justify a purchase price estimate of something more than $300,000. Contractors Supply had resold them or consigned them to the partnership for the total sum of $402,241. This figure included a one-time interest charge of 9 percent. Knopke Brothers (acting through Contractors Supply) would then lease out the compressors purchased from, or consigned from, Contractors Supply. In practice, 80 percent of the rental received was paid to Contractors Supply on the purchase price

of the compressors. When the price of the compressor was paid in full, the compressor belonged to Knopke Brothers. If a lease customer purchased the compressor from Knopke Brothers, the unpaid balance of Knopke Brothers' indebtedness to Contractors Supply was paid in full and any excess belonged to Knopke Brothers. This was the practice which was followed, but the Contractors Supply–Knopke Brothers invoice, which was the only sale contract, said nothing about this. At the time of the alleged conversion, $166,919.67 had been paid on the compressors' purchase price, and $235,321.33 remained to be paid. From the proceeds of compressor rentals and sales thus received from the partnership, Contractors Supply paid its floor plan note to Gardner–Denver. Contractors Supply would have been obligated to pay Gardner–Denver whether the compressors had been leased or not, but Contractors Supply's obligation to Gardner–Denver was structured in such a way as to be liquidated from the proceeds of the compressor rentals and sales received by Contractors Supply from the partnership.

The master, and the trial court, apparently viewed the "consignment" as cosmetic. The compressor sale contract between Contractors Supply and Knopke Brothers used all the sale terminology, and obligated Knopke Brothers to pay Contractors Supply the stated purchase price of the equipment. A true consignment is characterized by the absence of any liability on the consignee's part for the purchase price of the consigned property, except upon its sale or lease to another. 67 Am.Jur.2d *Sales* §§ 43–44 (1985). Richard J. Knopke testified that Knopke Brothers had no obligation to pay for the compressors except from the proceeds of the rentals or sales, as earlier described. The written contract, however, placed upon Knopke Brothers the obligation to pay Contractors Supply the amount of the sale price, and we are unable to say the master and the trial court were not correct in discounting the "consignment" theory.

Contractors Supply points to the following language of the conditional sales contract as justifying its repossession of the compressors on February 1, 1980: "Title to and right to possession of the goods purchased hereunder shall remain vested in Contractors until (the partnership) has paid in full therefor." The contract said at another place that Contractors had the right to take possession of the compressors "[I]f Contractors shall deem its rights to collect all sums due it to be insecure...." Contractors Supply gave no explanation for repossession of the compressors at the time it was done, but at the trial Richard J. Knopke, testified that the repossession was done because the partnership had been dissolved, was no longer in the equipment rental business, and Contractors Supply deemed its rights insecure.

■ There was neither pleading nor proof of the value of the compressors at the time of the alleged conversion, so the court awarded $1 nominal damages. The plaintiff is entitled to nominal damages when a conversion is proved, and no damages are proved. *Lacks v. R. Rowland & Co.*, 718 S.W.2d 513, 521 (Mo.App.1986); *Jackson v. Engert*, 453 S.W.2d 615, 617 (Mo.App.1970). The court then awarded $150,000 in punitive damages against Contractors Supply, and $15,000 punitive damages against Richard J. Knopke.

■ We first consider whether the evidence supports the court's finding there was a conversion of the compressors by Contractors Supply. We hold the evidence supports the trial court's finding on that point. It does not make any difference that "title" to the compressors remained in Contractors Supply, if it did. The issue in conversion is the right of possession. *Lacks*, 718 S.W.2d at 517. Knopke Brothers was not in default when Contractors Supply took over the compressors. While Richard J. Knopke testified that Contractors Supply felt insecure when the partnership was dissolved and was no longer in the equipment rental business, and testified that it was for that reason Contractors Supply had appropriated the compressors, that explanation first appeared in his testimony. The fact was Contractors Supply at the time it took over the compressors owed Knopke Brothers via the intercompany account more than the unpaid purchase price

of the compressors owing by Knopke Brothers to Contractors Supply. The evidence fully supports the trial court's conclusion that Knopke Brothers on February 1, 1980, had the right to possession of the 60 compressors, and Contractors Supply wrongfully converted the compressors to its own use.

■ Plaintiffs claim, upon their appeal from the judgment of the trial court that the amount paid by Knopke Brothers on the invoice price, $166,919.67, constituted an "equity" and some evidence of the property's market value as of the date of the conversion. The trial court did not so find. We would not on appeal find as a fact that $166,919.67 was the value of the converted property at the time of its conversion. The plaintiffs' "equity" figure of $166,919.67 would allow nothing for depreciation, or for market changes from the time of the purchase to the time of the conversion of February 1, 1980. Significant is the absence from the pleadings of an allegation, and from the record of testimony, that the reasonable market value of the compressors on February 1, 1980, was this much or that much.

Shedding more light on the February 1, 1980, value of the compressors is evidence received on a different issue, namely, the issue whether the 60 compressors had been conveyed to plaintiffs by a September 12, 1980, document entitled "Transfer of Title." That document, plaintiffs say, transferred the 60 compressors to them for their "book value." The "Transfer of Title" document was a negotiated, arms-length transaction. The compressors' book value on February 1, 1980, was therefore their actual value. Their book value was $235,231.33. That figure was the same as the unpaid balance of the purchase price still owing by the partnership to Contractors Supply.

The evidence thus supports the trial court's award only of nominal damages for the conversion.

### PUNITIVE DAMAGES FOR CONVERSION.

■ The award of $150,000 punitive damages against Contractors Supply, and $15,000 punitive damages against Richard J. Knopke, on the conversion claim is reversed. The evidence does not support a punitive damages award. While we have affirmed the trial court's judgment finding a conversion of the compressors by Contractors Supply, the evidence does not support the trial court's assessment of defendants' conduct as outrageous because prompted by an evil motive or reckless indifference to the rights of others. This is the punitive damages test. *Burnett v. Griffith,* 769 S.W.2d 780, 789 (Mo. banc 1989); *Johnson v. Rival Mfg. Co.,* 813 S.W.2d 78, 81 (Mo.App.1991). The compressors had never been transferred from Contractors Supply to the partnership, but at all times remained in the Contractors Supply inventory. This was the practice that had been followed since 1976. There is no evidence in the record that the compressors were worth more than $235,-321.33, which was the unpaid amount of the "consignment" price or purchase price owing from the partnership to Contractors Supply. In fact, the only oral testimony on this point, which was unchallenged, was that the compressors in 1980 could not have been sold for as much as $235,321.33. At the time of the conversion, Knopke Brothers, because of its dissolution, was no longer engaged in the rental business and would be unable to contribute sufficient rentals to service the Contractors Supply's compressor debt to Gardner–Denver. In taking over such rentals, and in treating the compressors as its own, Contractors Supply was surrendering any claim it might have against Knopke Brothers for the unpaid $235,321.33. Contractors Supply's actions with reference to the compressors were not wholly unreasonable.

### RENTAL OF COMPRESSORS.

■ The trial court upon the master's recommendation allowed to the partnership the sum of $80,514.84 for rental on the converted compressors from February 1, 1980, till November 30, 1983. The court found that the 60 compressors were included among property conveyed to plaintiffs in a September 12, 1980, contract among all

the parties which undertook to sell to plaintiff limited partners the tools and equipment of the partnership at their book value as of January 31, 1980, which was the partnership dissolution date.

Much of the trouble sprang from efforts to dispose of the rental equipment inventory belonging to Knopke Brothers. At the time of the dissolution, Contractors Supply believed plaintiffs had agreed to sell the equipment to it for its January 31, 1980, book value, $306,186.48. Contractors Supply commenced leasing out the equipment. The purchase of the equipment fell through on February 20. Contractors Supply ceased renting out the equipment. Julian Knopke undertook to divide the property in kind. Plaintiffs' one-half was set aside in a warehouse for plaintiffs to pick up. Defendants' half was sold to Contractors Supply, which continued to lease out its half of the equipment. Later, plaintiffs agreed to buy all the equipment for its January 31, 1980, book value and defendants agreed to sell at that figure. This culminated in the September 12, 1980, "Transfer of Title" document. Plaintiffs-purchasers, as a part of the deal, were to have all the net equipment rentals collected by Contractors Supply from and after January 31, 1980, up to September 12, 1980, the amount to be determined by an audit by Arthur Young and Company.

The issue later arose and confronts us now, as to whether the 60 converted compressors were included in the "Transfer of Title." Contractors Supply had taken over the compressors as of February 1, 1980— converted them, according to the later finding and judgment of the trial court, a judgment we are now affirming. Contractors Supply after that date leased the compressors on its own account. Apparently Contractors Supply considered the $235,321.33 balance of the purchase price satisfied, for it fully paid to the Knopke Brothers partners all the balance in the intercompany account, without deduction of the balance of the compressors' purchase price, and never at any later time made demand upon Knopke Brothers for the payment of such balance.

Plaintiffs, however, claim the compressors were included in the property transferred to the plaintiffs by the September 12, 1980, transfer of title agreement. The trial court agreed with plaintiffs, and found that Contractors Supply from January 31, 1980, to December 31, 1983, collected rentals of $535,587.87 on the compressors. The trial court then deducted Contractors Supply's costs incurred in leasing the compressors ($219,751.70), deducted the unpaid balance of the purchase price still owing from Knopke Brothers to Contractors Supply ($235,321.33) on the original purchase of the compressors, and awarded the plaintiffs judgment for the balance, or $80,-514.84, with 9 percent simple interest from and after January 1, 1984.

There is an inconsistency between the judgment on the conversion claim, on the one hand, and the judgment awarding plaintiffs the net rental on the compressors from January 31, 1980, to December 31, 1983. The conversion award (theoretically of the value of the compressors) would pass title to the compressors to Contractors Supply upon payment of the judgment, retroactive to date of conversion. *St. Louis Fixture & Show Case Co. v. F.W. Woolworth Co.*, 232 Mo.App. 10, 88 S.W.2d 254 (1935); 18 Am.Jur.2d *Conversion* § 180 (1985). We are unable to find that the Transfer of Title document, which the plaintiffs depend upon, includes the 60 compressors in its terms, or that any party to the Transfer of Title contract contemplated their inclusion. The list attached to the Transfer of Title document does not itemize the 60 compressors. The book value total does not include the book value of the compressors (which would, we estimate, have very nearly doubled the book value shown on the Transfer of Title document). It is not reasonable to suppose that Contractors Supply would have transferred the compressors without some provision for the payment of the $235,321.33 unpaid balance on the purchase price, nor could plaintiffs reasonably have expected it. The contract language, which included within conveyed property such Knopke Brothers property as might have been omitted from a 24-page itemized list attached to the contract, was intended to gather in property which was overlooked and inadvertently

omitted from the itemization. It did not mean to add such a major property as 60 compressors with a book value of $235,-321.33. All these considerations lead to the conclusion the compressors were not included in the "Transfer of Property" document.

We reverse the $80,514.84 award.

## DEPRECIATION.

■ As part of the winding up of the partnership affairs and distribution to the partners, it was agreed (the September 12, 1980, "Transfer of Title" document) that certain inventory, equipment, tools, parts and supplies belonging to the partnership should be conveyed to the limited partners, plaintiffs here, at its book value as of January 31, 1980.

The transfer of title was to take place on September 12, 1980.

The plaintiffs were to receive, in addition to the property in kind, the net profit from its rental to partnership customers from January 31, 1980, to September 12, 1980. That profit was determined by an audit by Arthur Young & Co., to have been $47,588. General partner defendant Julian Knopke distributed this amount to the limited partners pro rata. To arrive at the net figure the auditors deducted, among other costs of sales and rentals, the amount of $97,042 depreciation accruing on the property from January 31, to September 12, 1980.

The trial court found the $97,042 should not have been deducted, and gave plaintiffs judgment for that amount. Defendants contend this award was erroneous.

The trial court was correct on this point. Plaintiffs were receiving property at its book value as of January 31, 1980. From that point on, plaintiffs bore the diminution in value of the equipment cause by depreciation. The property was worth less—theoretically, $97,042 less—on September 12 than on January 31. By the accountant's audit, defended on this appeal by Contractors Supply and by Julian Knopke, plaintiffs would not only be suffering the depreciation of their property in that amount, but would in addition be paying that amount in cash. The cost of the depreciation of the property would thereby be doubled to plaintiffs. Contractors Supply, or general partner Julian Knopke, on the other hand, received the cash representing depreciation on property which was, for accounting purposes, not their own after January 31, 1980. Defendants underline certain language of the parties' agreement, which says: "The determination of deductions, offsets and net income from the rental and sale of this conveyed property shall be based upon the application of generally accepted accounting principles applied on a basis consistent with that of the preceding years prior to fiscal year ending January 31, 1980." There is no testimony, and there is no rationale, that any "generally accepted accounting principle" would require the deduction of depreciation in the context of this contract between the parties, that is, where plaintiffs had purchased the property at its January 31 book value and beneficially owned it after that date. Defendants after that date had no economic interest in the property, and were not entitled to the depreciation.

Defendants' contention is disallowed, and the trial court's award of $97,042 for depreciation is affirmed.

## PAYMENT OF LEGAL FEES BY PARTNERSHIP.

■ The general partner, Julian Knopke, was surcharged with the sum of $61,887.18 paid by the partnership to attorney Richard W. Miller and the law firm of Miller and Glynn. The law firm's services were rendered in connection with attempts to dissolve the partnership and distribute the assets, but the plaintiffs' theory is that the firm rendered the services during a time when there was a clear conflict between the plaintiff group and the defendant group. The services were rendered between February 1, 1980, the dissolution date, and September 16, 1981, when Julian Knopke rendered his final accounting of the partnership property. The plaintiffs filed their first petition on March 10, 1980, scarcely more than a month after the dissolution date, so most of the services included in the $61,887.18 in billings were rendered

while the present litigation was in progress. The conflict, however, had arisen even before the dissolution date of January 31, 1980, with the opposing camps clearly identified. Mr. Miller, throughout the long litigation, has represented the defendant camp, necessarily representing positions in direct opposition to the partnership's interests. During the period in question, it appears that all his services related to the Knopke Brothers dissolution and were paid for from Knopke Brothers funds, and none of the services were paid by Contractors Supply or any of the other defendants. It is true that some substantial part of the Miller services were rendered to the partnership at the behest of general partner, Julian Knopke, in seeking out a path for the resolution of the problems of dissolution and distribution, but there was no evidence from which the master or the court could separate the services primarily beneficial to the partnership from those primarily benefitting the defendant group, and in some instances in actual opposition to the partnership interests. It was not the master's job, nor that of the plaintiffs, but Julian Knopke's, to show what portion of the Miller services during the period in question was properly chargeable to the partnership. It was Julian Knopke who failed to call for strict segregation of the services—if indeed that had been possible, given the inextricable conflicts of interest inherent in Julian Knopke's attempts to dissolve the partnership and distribute the assets without the intervention of a disinterested third party—and allowed them to become commingled.

The award to the partnership of judgment against Julian Knopke for $61,887.18 for attorney fees paid from partnership funds, plus interest, is affirmed.

### INCREASED AUDIT COSTS.

Julian Knopke appeals from a portion of the judgment which awards to the partnership $42,670.80, an amount equal to 90 percent of the cost of an Arthur Young and Company audit made under the terms of the September 12, 1980, Transfer of Title document.

The September 12, 1980, Transfer of Title document called for payment to plaintiffs of the net rentals earned on substantially all of Knopke Brothers rental equipment from January 31, 1980 ("conveyed property.") Not included in the transfer were those items of property which were out on rental in the hands of rental customers on September 12, 1980 ("excluded property.") The latter category constituted only a small percentage of the total. As to the latter group, plaintiffs under the terms of the Transfer of Title agreement were to get one-half the net rentals from January 31, 1980, until the respective items of property were returned to Contractors Supply by the lessee. The net rental income on the "excluded property" was also to be determined by the Arthur Young and Company audit. Upon the return of such property, plaintiffs were entitled to purchase it from the partnership for one-half its then book value.

The cost of the audit amounted to $47,412.00. There was evidence from which the master could find, as he did find, that the cost of the audit was substantially increased by Julian Knopke's improper commingling, after January 31, 1980, of records of incomes and expenses of partnership rental property with the Contractors Supply rental property. That came about in this way: At one point in the dissolution process, after efforts to sell the partnership property had failed, Julian Knopke in March, 1980, undertook to divide the property in specie half-and-half, with the plaintiff group to get half and the defendant group to get half. He set aside the plaintiffs' half in a warehouse for them to pick up, and the defendants' half was (we infer) sold to Contractors Supply.

This attempt at in-kind division without plaintiffs' consent was unauthorized and wrongful—Section 358.380, RSMo 1986; C.J.S. *Partnership* § 388 (1950)—although there is no claim the division was not fairly done. After this plan was rejected by plaintiffs, the agreement was reached which resulted in the September 12, 1980, Transfer of Title document. While it was possible from the records maintained by

Contractors Supply to trace the property received by it from the partnership, and accurately to compute the net rental received from it, the manual sorting out of invoices substantially increased the cost of the audit.

 The parties agree that it is the duty of the general partner to keep accurate books which fairly reflect the affairs of the partnership—*Adams v. Mason*, 358 S.W.2d 7, 15 (Mo.1962); *Zelch v. Ahlemeyer*, 592 S.W.2d 482, 485 (Mo.App.1979). That requirement implies that the records not be unnecessarily obscure, inaccessible or inconvenient. There is evidence in the record which would support the court's finding that 90 percent of the cost of the audit was caused by the entanglement of the partnership rental records with those of Contractors Supply.

The trial court directed that, from the $42,670.80 recovery by the partnership from Julian Knopke, plus interest, 25 percent should be distributed by the partnership to defendant group and 75 percent to the plaintiff group. This was because the increased audit cost was attributable half to the "conveyed equipment" (from which plaintiffs got all the net rental income), and half to "excluded equipment," from which plaintiffs got only half the rental income. Neither party makes any complaint about this distribution among the partners.

### PLAINTIFFS' ATTORNEYS FEES AND LITIGATION EXPENSES.

The trial judge's allowance to plaintiffs for attorneys' fees in the sum of $261,694 to be paid from partnership funds created by plaintiffs' attorneys' efforts has spawned appeals both by defendants and plaintiffs.

 Defendants claim the attorneys' fees are excessive. The legal principles upon which defendants base their complaint are correct. Those are: In common fund cases, parties are entitled to recover attorneys' fees for only those activities conducted to benefit the fund, *Leggett v. Missouri State Life Ins. Co.*, 342 S.W.2d 833, 936 (Mo. banc 1960), and services which do not benefit the fund are not recoverable. However, attorneys fees may be recoverable for services which had a reasonable prospect of enhancing the common fund; an attorney is not obliged to be clairvoyant in predicting the success of the claims he asserts. *See Jesser v. Mayfair Hotel, Inc.*, 360 S.W.2d 652, 664 (Mo. banc 1962). Attorneys' fees are not recoverable for services rendered in presentation of claims for attorneys' fees. *Lindy Bros. Builders, Inc. v. American Radiator & Standard Sanitary Corp.*, 540 F.2d 102, 111 (3d Cir. 1976). The degree of success in the pursuit of the claims in behalf of the common fund, i.e., the amount recovered, is taken into account in the amount of attorneys fees awarded. *O'Brien v. B.L.C. Ins. Co.*, 768 S.W.2d 64, 71 (Mo. banc 1989).

The trial court expressly noted the foregoing rules and took them into account in arriving at the attorneys fees award.

 The trial court awarded attorneys' fees on the basis of the award made by its judgment. Two of the items awarded, however—punitive damages amounting to $165,000, and the net rental from the 60 compressors in the amount of $80,514.84—we have reversed, thus reducing the judgment by an estimated $300,000, including prejudgment interest allowed by the court on the compressor rental judgment. (There was no allowance of prejudgment interest on the punitive damages award.) This leaves a balance on derivative claims (not including the non-derivative depreciation claim based upon the Transfer of Title agreement) of $282,152,42, which prejudgment interest will increase to a figure approaching $500,000. The amount of the award to the partnership is of course an item to be taken into account in the award of attorneys' fees, *O'Brien v. B.L.C. Ins. Co., supra,* and the attorneys fee award must be reduced as the amount of the judgment is reduced, although not necessarily ratably.

We might return this case to the trial court for reconsideration of attorneys' fees, but we think it is better to make our own award of attorneys' fees, leaving unresolved as few issues as possible. See Rule

84.14. We reduce the attorneys' fees by 25 percent. The new award is in the total sum of $196,270.50, to be divided as follows: Burrell, Seigfreid & Bingham, $139,287.00; George L. Gisler, $44,741.25; and Arthur H. Stoup, $12,242.25.

■■■ Plaintiffs complain, with respect to the award of attorneys' fees, of the denial of their claim for litigation expenses of $51,174.48, including the fees of expert witness accountant Merrigan in the sum of $31,951.74. The trial court expressly found that such expenses were reasonable and necessary to the prosecution of the derivative claims (not including the depreciation claim), but disallowed them. Defendants–Respondents do not defend the disallowance with much persuasive effect. Their case of *Nichols v. Bossert*, 727 S.W.2d 211 (Mo.App.1987), is not in point. In the context of this case, litigation expenses, including expert witness fees, stand on the same ground as attorney services. *See Jesser v. Mayfair Hotel, Inc.*, 360 S.W.2d 652, 663 (Mo. banc 1962). We reverse the trial court's disallowance of litigation expenses of $51,174.48, and allow the same to plaintiffs.

Plaintiffs further contend that the attorneys' fees and litigation expenses ought in equity to be paid from the defendants' partnership share of the fund, and that plaintiffs ought not to bear any part thereof. They cite no cases in support of this proposition, and we find none. Plaintiffs' point is disallowed.

■■■■ We have considered plaintiffs' claim the trial court erred in disallowing attorneys' fees on the depreciation claim. This claim, however, was the plaintiffs' own and does not benefit the common fund. Attorneys' fees expended and incurred in the claim come within the rule that each party must ordinarily bear his own attorneys' fees. *Nichols v. Bossert*, 727 S.W.2d 211, 213–14 (Mo.App.1987).

## CROSS CLAIMS AGAINST RICHARD E. KNOPKE.

Defendants appeal the court's judgment denying relief on all three counts of a cross-claim (as defendants have denominated it) against Richard E. Knopke for indemnification or contribution. Richard E. Knopke was a general partner until he sold his partnership interest to Contractors Supply in 1979. Richard E. Knopke has died and Marcella M. Knopke, personal representative, has been substituted. He was also a stockholder and officer of Contractors Supply until he sold his stock in 1979.

Count I of the cross-claim was a claim for indemnification or contribution under Rule 55.32(f), on the ground Richard E. Knopke, as a general partner, was equally liable with Julian Knopke. Count II was a claim that, if Contractors Supply should be held liable for intercompany account interest, Richard E. Knopke, who had sold his Contractors Supply stock to the corporation would have been overpaid for his stock in Contractors Supply. Count II sought reimbursement of the amount by which the purchase price for his stock exceeded its value. Count III sought indemnification from Richard E. Knopke in case Julian Knopke should be found to have been mentally incapacitated.

■■■ The trial court denied relief on all three counts, because of the ground there was no evidence to support any of the three counts. The appellants' brief attacks this ruling, arguing cross claimants had not abandoned their cross claims. We are convinced, but it was not on the ground of abandonment that the court denied relief, but on the merits. The court only noted that defendants had not supported their respective claims by their post-trial briefs. Neither have cross claimants supported their claims by their brief in this court. Neither their "Point Relied On" nor their argument points out wherein and why the court was in error in his ruling on the merits of the cross-claim, nor do they cite any authorities for their positions. The point presents nothing for review. *See,* Rule 84.04(d). Points and arguments omitted from an appellant's initial brief may not be supplied by a reply brief, when the respondent has no chance to reply. *See, State ex rel. Houser v. St. Louis Union Trust Co.*, 248 S.W.2d 592, 594 (Mo.1952); *Morovitz v. Morovitz*, 778 S.W.2d 369, 370

n. 1 (Mo.App.1989), *cert. denied,* 494 U.S. 1085, 110 S.Ct. 1822, 108 L.Ed.2d 952 (1990).

The court's judgment denying relief on defendants' cross claim, and on each count thereof, is affirmed.

### APPELLATE ATTORNEY FEES.

Plaintiffs file in this court their motion for attorneys' fees on appeal along with detailed itemization of services and expenses, and defendants have filed suggestions in opposition thereto. Plaintiffs' entitlement to attorneys' fees for services on appeal stands upon the same ground as their entitlement to attorneys' fees for services in the trial court, discussed in an earlier portion of this opinion. *See e.g., Wooten v. DeMean,* 788 S.W.2d 522, 529 (Mo.App.1990). We have authority to allow, and to fix the amount, of attorneys' fees on appeal. *Id.* We exercise this power with caution, thinking in most cases the trial court is better equipped to hear evidence and argument, if indicated—for which we are unequipped. In this case, there do not appear to be any factual issues to be resolved with reference to the attorneys' fees. In some ways, we have the superior opportunity to gauge the value of appellate attorneys' work. We are influenced by the long history of the case, which has now passed a dozen years. We allow to the partnership for plaintiffs' appellate attorneys' fees and expenses the sum of $24,500, to be included in the trial court's judgment upon remand.

### DISPOSITION OF APPEAL.

Judgment affirmed in part and reversed in part, and case remanded to trial court for entry of a new judgment in accordance with the foregoing opinion. The costs of the appeal are assessed one-half against the partnership and one-half against Contractors Supply and Julian Knopke. Plaintiffs' and cross claim defendant's motion to dismiss defendants' appeal is denied.

All concur.